## WICKARD, SECRETARY OF AGRICULTURE, ET AL. *v.* FILBURN.

No. 59. Argued May 4, 1942. Reargued October 13, 1942.—Decided November 9, 1942.

---

[12] 80 Cong. Rec. 9071, 74th Cong., 2d Sess.

*Solicitor General Fahy,* with whom *Assistant Attorney General Arnold* and *Messrs. Robert L. Stern, John S. L. Yost, W. Carroll Hunter,* and *Robert H. Shields* were on the briefs, on the original argument and on the reargument (*Mr. James C. Wilson* was also on the brief on the original argument), for appellants.

*Messrs. Webb R. Clark* and *Harry N. Routzohn,* with whom *Mr. Robert S. Nevin* was on the briefs, for appellee.

*Messrs. William Lemke, Louis M. Day,* and *T. A. Billingsly* filed a brief, as *amici curiae,* in support of appellee.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The appellee filed his complaint against the Secretary of Agriculture of the United States, three members of the County Agricultural Conservation Committee for Montgomery County, Ohio, and a member of the State Agricultural Conservation Committee for Ohio. He sought to enjoin enforcement against himself of the marketing penalty imposed by the amendment of May 26, 1941,[1] to the Agricultural Adjustment Act of 1938,[2] upon that part of his 1941 wheat crop which was available for marketing in excess of the marketing quota established for his farm. He also sought a declaratory judgment that the wheat marketing quota provisions of the Act as amended and applicable to him were unconstitutional because not sus-

---

[1] 55 Stat. 203, 7 U. S. C. (Supp. No. I) § 1340.

[2] 52 Stat. 31, as amended, 7 U. S. C. § 1281 *et seq.*

tainable under the Commerce Clause or consistent with the Due Process Clause of the Fifth Amendment.

The Secretary moved to dismiss the action against him for improper venue, but later waived his objection and filed an answer. The other appellants moved to dismiss on the ground that they had no power or authority to enforce the wheat marketing quota provisions of the Act, and after their motion was denied they answered, reserving exceptions to the ruling on their motion to dismiss.[3] The case was submitted for decision on the pleadings and upon a stipulation of facts.

The appellee for many years past has owned and operated a small farm in Montgomery County, Ohio, maintaining a herd of dairy cattle, selling milk, raising poultry, and selling poultry and eggs. It has been his practice to raise a small acreage of winter wheat, sown in the Fall and harvested in the following July; to sell a portion of the crop; to feed part to poultry and livestock on the farm, some of which is sold; to use some in making flour for home consumption; and to keep the rest for the following seeding. The intended disposition of the crop here involved has not been expressly stated.

In July of 1940, pursuant to the Agricultural Adjustment Act of 1938, as then amended, there were established for the appellee's 1941 crop a wheat acreage allotment of 11.1 acres and a normal yield of 20.1 bushels of wheat an acre. He was given notice of such allotment in July of 1940, before the Fall planting of his 1941 crop of wheat, and again in July of 1941, before it was harvested. He sowed, however, 23 acres, and harvested from his 11.9 acres of excess acreage 239 bushels, which under the terms of the Act as amended on May 26, 1941, constituted farm

---

[3] Because of the conclusion reached as to the merits, we need not consider the question whether these appellants would be proper if our decision were otherwise.

marketing excess, subject to a penalty of 49 cents a bushel, or $117.11 in all. The appellee has not paid the penalty and he has not postponed or avoided it by storing the excess under regulations of the Secretary of Agriculture, or by delivering it up to the Secretary. The Committee, therefore, refused him a marketing card, which was, under the terms of Regulations promulgated by the Secretary, necessary to protect a buyer from liability to the penalty and upon its protecting lien.[4]

The general scheme of the Agricultural Adjustment Act of 1938 as related to wheat is to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce.[5] Within prescribed limits and by prescribed standards the Secretary of Agriculture is directed to ascertain and proclaim each year a national acreage allotment for the next crop of wheat, which is then apportioned to the states and their counties, and is eventually broken up into allotments for individual farms.[6] Loans and payments to wheat farmers are authorized in stated circumstances.[7]

The Act further provides that whenever it appears that the total supply of wheat as of the beginning of any marketing year, beginning July 1, will exceed a normal year's domestic consumption and export by more than 35 per cent, the Secretary shall so proclaim not later than May 15 prior to the beginning of such marketing year; and that during the marketing year a compulsory national marketing quota shall be in effect with respect to the marketing

---

[4] Wheat—507, §§ 728.240, 728.248, 6 Federal Register 2695, 2699–2701.

[5] § 331, 7 U. S. C. § 1331.

[6] § 335, 7 U. S. C. § 1335.

[7] §§ 302 (b) (h), 303, 7 U. S. C. §§ 1302 (b) (h), 1303; § 10 of the amendment of May 26, 1941, 7 U. S. C. (Supp. I), § 1340 (10).

of wheat.[8] Between the issuance of the proclamation and June 10, the Secretary must, however, conduct a referendum of farmers who will be subject to the quota, to determine whether they favor or oppose it; and, if more than one-third of the farmers voting in the referendum do oppose, the Secretary must, prior to the effective date of the quota, by proclamation suspend its operation.[9]

On May 19, 1941, the Secretary of Agriculture made a radio address to the wheat farmers of the United States in which he advocated approval of the quotas and called attention to the pendency of the amendment of May 26, 1941, which had at the time been sent by Congress to the White House, and pointed out its provision for an increase in the loans on wheat to 85 per cent of parity. He made no mention of the fact that it also increased the penalty from 15 cents a bushel to one-half of the parity loan rate of about 98 cents, but stated that "Because of the uncertain world situation, we deliberately planted several million extra acres of wheat. . . . Farmers should not be penalized because they have provided insurance against shortages of food."

Pursuant to the Act, the referendum of wheat growers was held on May 31, 1941. According to the required published statement of the Secretary of Agriculture, 81 per cent of those voting favored the marketing quota, with 19 per cent opposed.

The court below held, with one judge dissenting, that the speech of the Secretary invalidated the referendum; and that the amendment of May 26, 1941, "in so far as it increased the penalty for the farm marketing excess over the fifteen cents per bushel prevailing at the time of planting and subjected the entire crop to a lien for the payment thereof," should not be applied to the appellee because

---

[8] § 335 (a), 7 U. S. C. § 1335 (a).

[9] § 336, 7 U. S. C. § 1336.

as so applied it was retroactive and in violation of the Fifth Amendment; and, alternatively, because the equities of the case so required. 43 F. Supp. 1017. Its judgment permanently enjoined appellants from collecting a marketing penalty of more than 15 cents a bushel on the farm marketing excess of appellee's 1941 wheat crop, from subjecting appellee's entire 1941 crop to a lien for the payment of the penalty, and from collecting a 15-cent penalty except in accordance with the provisions of § 339 of the Act as that section stood prior to the amendment of May 26, 1941.[10] The Secretary and his co-defendants have appealed.[11]

## I

The holding of the court below that the Secretary's speech invalidated the referendum is manifest error. Read as a whole and in the context of world events that constituted his principal theme, the penalties of which he spoke were more likely those in the form of ruinously low prices resulting from the excess supply rather than the penalties prescribed in the Act. But under any interpretation the speech cannot be given the effect of invalidating the referendum. There is no evidence that any voter put upon the Secretary's words the interpretation that impressed the court below or was in any way misled. There is no showing that the speech influenced the outcome of the referendum. The record in fact does not show that any, and does not suggest a basis for even a guess as to how many, of the voting farmers dropped work to listen to "Wheat Farmers and the Battle for

[10] 7 U. S. C. § 1339. This imposed a penalty of 15¢ per bushel upon wheat marketed in excess of the farm marketing quota while such quota was in effect. See also, amendments of July 26, 1939, 53 Stat. 1126, 7 U. S. C. § 1335 (c), and of July 2, 1940, 54 Stat. 727, 7 U. S. C. § 1301 (b) (6) (A), (B).

[11] 50 Stat. 752–753, § 3, 28 U. S. C. § 380a.

Democracy" at 11:30 in the morning of May 19th, which was a busy hour in one of the busiest of seasons. If this discourse intended reference to this legislation at all, it was of course a public Act, whose terms were readily available, and the speech did not purport to be an exposition of its provisions.

To hold that a speech by a Cabinet officer, which failed to meet judicial ideals of clarity, precision, and exhaustiveness, may defeat a policy embodied in an Act of Congress, would invest communication between administrators and the people with perils heretofore unsuspected. Moreover, we should have to conclude that such an officer is able to do by accident what he has no power to do by design. Appellee's complaint, in so far as it is based on this speech, is frivolous, and the injunction, in so far as it rests on this ground, is unwarranted. *United States* v. *Rock Royal Co-operative,* 307 U. S. 533.

## II

It is urged that under the Commerce Clause of the Constitution, Article I, § 8, clause 3, Congress does not possess the power it has in this instance sought to exercise. The question would merit little consideration since our decision in *United States* v. *Darby,* 312 U. S. 100,[12] sustaining the federal power to regulate production of goods for commerce, except for the fact that this Act extends federal regulation to production not intended in any part for commerce but wholly for consumption on the farm. The Act includes a definition of "market" and its derivatives, so that as related to wheat, in addition to its conventional meaning, it also means to dispose of "by feeding (in any

---

[12] See also, *Gray* v. *Powell,* 314 U. S. 402; *United States* v. *Wright-wood Dairy Co.,* 315 U. S. 110; *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148; *Kirschbaum Co.* v. *Walling,* 316 U. S. 517; *Overnight Transportation Co.* v. *Missel,* 316 U. S. 572.

form) to poultry or livestock which, or the products of which, are sold, bartered, or exchanged, or to be so disposed of." [13] Hence, marketing quotas not only embrace all that may be sold without penalty but also what may be consumed on the premises. Wheat produced on excess acreage is designated as "available for marketing" as so defined, and the penalty is imposed thereon.[14] Penalties do not depend upon whether any part of the wheat, either within or without the quota, is sold or intended to be sold. The sum of this is that the Federal Government fixes a quota including all that the farmer may harvest for sale or for his own farm needs, and declares that wheat produced on excess acreage may neither be disposed of nor used except upon payment of the penalty, or except it is stored as required by the Act or delivered to the Secretary of Agriculture.

Appellee says that this is a regulation of production and consumption of wheat. Such activities are, he urges, beyond the reach of Congressional power under the Commerce Clause, since they are local in character, and their effects upon interstate commerce are at most "indirect." In answer the Government argues that the statute regulates neither production nor consumption, but only marketing; and, in the alternative, that if the Act does go beyond the regulation of marketing it is sustainable as a "necessary and proper" [15] implementation of the power of Congress over interstate commerce.

The Government's concern lest the Act be held to be a regulation of production or consumption, rather than of marketing, is attributable to a few dicta and decisions of this Court which might be understood to lay it down that activities such as "production," "manufacturing," and

---

[13] 54 Stat. 727, 7 U. S. C. § 1301 (b) (6) (A), (B).

[14] §§ 1, 2, of the amendment of May 26, 1941; Wheat—507, § 728.251, 6 Federal Register 2695, 2701.

[15] Constitution, Article I, § 8, cl. 18.

"mining" are strictly "local" and, except in special circumstances which are not present here, cannot be regulated under the commerce power because their effects upon interstate commerce are, as matter of law, only "indirect." [16] Even today, when this power has been held to have great latitude, there is no decision of this Court that such activities may be regulated where no part of the product is intended for interstate commerce or intermingled with the subjects thereof. We believe that a review of the course of decision under the Commerce Clause will make plain, however, that questions of the power of Congress are not to be decided by reference to any formula which would give controlling force to nomenclature such as "production" and "indirect" and foreclose consideration of the actual effects of the activity in question upon interstate commerce.

At the beginning Chief Justice Marshall described the federal commerce power with a breadth never yet exceeded. *Gibbons* v. *Ogden,* 9 Wheat. 1, 194–195. He made emphatic the embracing and penetrating nature of this power by warning that effective restraints on its exercise must proceed from political rather than from judicial processes. *Id.* at 197.

---

[16] After discussing and affirming the cases stating that such activities were "local," and could be regulated under the Commerce Clause only if by virtue of special circumstances their effects upon interstate commerce were "direct," the opinion of the Court in *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 308, stated that: "The distinction between a direct and an indirect effect turns, not upon the magnitude of either the cause or the effect, but entirely upon the manner in which the effect has been brought about. . . . the matter of degree has no bearing upon the question here, since that question is not—What is the *extent* of the local activity or condition, or the *extent* of the effect produced upon interstate commerce? but—What is the *relation* between the activity or condition and the effect?" See also, cases cited *infra,* notes 17 and 21.

For nearly a century, however, decisions of this Court under the Commerce Clause dealt rarely with questions of what Congress might do in the exercise of its granted power under the Clause, and almost entirely with the permissibility of state activity which it was claimed discriminated against or burdened interstate commerce. During this period there was perhaps little occasion for the affirmative exercise of the commerce power, and the influence of the Clause on American life and law was a negative one, resulting almost wholly from its operation as a restraint upon the powers of the states. In discussion and decision the point of reference, instead of being what was "necessary and proper" to the exercise by Congress of its granted power, was often some concept of sovereignty thought to be implicit in the status of statehood. Certain activities such as "production," "manufacturing," and "mining" were occasionally said to be within the province of state governments and beyond the power of Congress under the Commerce Clause.[17]

It was not until 1887, with the enactment of the Interstate Commerce Act,[18] that the interstate commerce power began to exert positive influence in American law and life. This first important federal resort to the commerce power was followed in 1890 by the Sherman Anti-Trust Act[19] and, thereafter, mainly after 1903, by many others. These statutes ushered in new phases of adjudication, which required the Court to approach the interpretation of the Commerce Clause in the light of an actual exercise by Congress of its power thereunder.

When it first dealt with this new legislation, the Court adhered to its earlier pronouncements, and allowed but

---

[17] *Veazie* v. *Moor,* 14 How.. 568, 573–574; *Kidd* v. *Pearson,* 128 U. S. 1, 20–22.

[18] 24 Stat. 379, 49 U. S. C. § 1, *et seq.*

[19] 26 Stat. 209, 15 U. S. C. § 1, *et seq.*

little scope to the power of Congress. *United States* v. *Knight Co.*, 156 U. S. 1.[20] These earlier pronouncements also played an important part in several of the five cases in which this Court later held that Acts of Congress under the Commerce Clause were in excess of its power.[21]

Even while important opinions in this line of restrictive authority were being written, however, other cases called forth broader interpretations of the Commerce Clause destined to supersede the earlier ones, and to bring about a return to the principles first enunciated by Chief Justice Marshall in *Gibbons* v. *Ogden, supra.*

Not long after the decision of *United States* v. *Knight Co., supra,* Mr. Justice Holmes, in sustaining the exercise of national power over intrastate activity, stated for the Court that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Swift & Co.* v. *United States,* 196 U. S. 375, 398. It was soon demonstrated that the effects of many kinds of intrastate activity upon interstate commerce were such as to make them a proper subject of federal regulation.[22] In some cases sustaining the exercise of federal power over intrastate matters the term "direct"

---

[20] See also, *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604.

[21] *Employers' Liability Cases,* 207 U. S. 463; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330; *Schechter Corp.* v. *United States,* 295 U. S. 495; *Carter* v. *Carter Coal Co.,* 298 U. S. 238; cf. *United States* v. *Dewitt,* 9 Wall. 41; *Trade-Mark Cases,* 100 U. S. 82; *Hill* v. *Wallace,* 259 U. S. 44; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 259–260; *Oliver Iron Co.* v. *Lord,* 262 U. S. 172, 178–179; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165.

[22] *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Swift & Co.* v. *United States, supra; Loewe* v. *Lawlor,* 208 U. S. 274; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *Southern Ry. Co.* v. *United States,* 222 U. S. 20; *Second Employers' Liability Cases,* 223 U. S. 1; *United States* v. *Patten,* 226 U. S. 525.

was used for the purpose of stating, rather than of reaching, a result; [23] in others it was treated as synonymous with "substantial" or "material"; [24] and in others it was not used at all. [25]  Of late its use has been abandoned in cases dealing with questions of federal power under the Commerce Clause.

In the *Shreveport Rate Cases*, 234 U. S. 342, the Court held that railroad rates of an admittedly intrastate character and fixed by authority of the state might, nevertheless, be revised by the Federal Government because of the economic effects which they had upon interstate commerce.  The opinion of Mr. Justice Hughes found federal intervention constitutionally authorized because of "matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." *Id.* at 351.

The Court's recognition of the relevance of the economic effects in the application of the Commerce Clause, ex-

---

[23] *United Leather Workers* v. *Herkert Co.*, 265 U. S. 457, 471; cf. *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 511; *Di Santo* v. *Pennsylvania*, 273 U. S. 34, 44 (dissent); *Northern Securities Co.* v. *United States*, 193 U. S. 197, 395; *Standard Oil Co.* v. *United States*, 221 U. S. 1, 66–69.

[24] In *Santa Cruz Co.* v. *Labor Board*, 303 U. S. 453, 466–467, Chief Justice Hughes said: " 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.'  Whatever terminology is used, the criterion is necessarily one of degree and must be so defined.  This does not satisfy those who seek for mathematical or rigid formulas.  But such formulas are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' "

[25] *Baltimore & Ohio R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612; *Second Employers' Liability Cases*, 223 U. S. 1; *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194.

emplified by this statement, has made the mechanical application of legal formulas no longer feasible. Once an economic measure of the reach of the power granted to Congress in the Commerce Clause is accepted, questions of federal power cannot be decided simply by finding the activity in question to be "production," nor can consideration of its economic effects be foreclosed by calling them "indirect." The present Chief Justice has said in summary of the present state of the law: "The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. . . . The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. . . . It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power." *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 119.

Whether the subject of the regulation in question was "production," "consumption," or "marketing" is, therefore, not material for purposes of deciding the question of federal power before us. That an activity is of local character may help in a doubtful case to determine whether Congress intended to reach it.[26] The same consideration might help in determining whether in the absence of Congressional action it would be permissible for the state

---

[26] Cf. *Federal Trade Commission* v. *Bunte Bros.,* 312 U. S. 349.

to exert its power on the subject matter, even though in so doing it to some degree affected interstate commerce. But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."

The parties have stipulated a summary of the economics of the wheat industry. Commerce among the states in wheat is large and important. Although wheat is raised in every state but one, production in most states is not equal to consumption. Sixteen states on average have had a surplus of wheat above their own requirements for feed, seed, and food. Thirty-two states and the District of Columbia, where production has been below consumption, have looked to these surplus-producing states for their supply as well as for wheat for export and carry-over.

The wheat industry has been a problem industry for some years. Largely as a result of increased foreign production and import restrictions, annual exports of wheat and flour from the United States during the ten-year period ending in 1940 averaged less than 10 per cent of total production, while during the 1920's they averaged more than 25 per cent. The decline in the export trade has left a large surplus in production which, in connection with an abnormally large supply of wheat and other grains in recent years, caused congestion in a number of markets; tied up railroad cars; and caused elevators in some instances to turn away grains, and railroads to institute embargoes to prevent further congestion.

Many countries, both importing and exporting, have sought to modify the impact of the world market conditions on their own economy. Importing countries have taken measures to stimulate production and self-sufficiency. The four large exporting countries of Argen-

tina, Australia, Canada, and the United States have all undertaken various programs for the relief of growers. Such measures have been designed, in part at least, to protect the domestic price received by producers. Such plans have generally evolved towards control by the central government.[27]

In the absence of regulation, the price of wheat in the United States would be much affected by world conditions. During 1941, producers who coöperated with the Agricultural Adjustment program received an average price on the farm of about $1.16 a bushel, as compared with the world market price of 40 cents a bushel.

Differences in farming conditions, however, make these benefits mean different things to different wheat growers. There are several large areas of specialization in wheat, and the concentration on this crop reaches 27 per cent of the crop land, and the average harvest runs as high as

---

[27] It is interesting to note that all of these have federated systems of government, not of course without important differences. In all of them, wheat regulation is by the national government. In Argentina, wheat may be purchased only from the national Grain Board. A condition of sale to the Board, which buys at pegged prices, is the producer's agreement to become subject to restrictions on planting. See Nolan, Argentine Grain Price Guaranty, Foreign Agriculture (Office of Foreign Agricultural Relations, Department of Agriculture) May, 1942, pp. 185, 202. The Australian system of regulation includes the licensing of growers, who may not sow more than the amount licensed, and who may be compelled to cut part of their crops for hay if a heavy crop is in prospect. See Wright, Australian Wheat Stabilization, Foreign Agriculture (Office of Foreign Agricultural Relations, Department of Agriculture) September, 1942, pp. 329, 336. The Canadian Wheat Board has wide control over the marketing of wheat by the individual producer. 4 Geo. VI, c. 25, § 5. Canadian wheat has also been the subject of numerous Orders in Council. E. g., 6 Proclamations and Orders in Council (1942) 183, which gives the Wheat Board full control of sale, delivery, milling and disposition by any person or individual. See, also, Wheat Acreage Reduction Act, 1942, 6 Geo. VI, c. 10.

155 acres. Except for some use of wheat as stock feed and for seed, the practice is to sell the crop for cash. Wheat from such areas constitutes the bulk of the interstate commerce therein.

On the other hand, in some New England states less than one per cent of the crop land is devoted to wheat, and the average harvest is less than five acres per farm. In 1940 the average percentage of the total wheat production that was sold in each state, as measured by value, ranged from 29 per cent thereof in Wisconsin to 90 per cent in Washington. Except in regions of large-scale production, wheat is usually grown in rotation with other crops; for a nurse crop for grass seeding; and as a cover crop to prevent soil erosion and leaching. Some is sold, some kept for seed, and a percentage of the total production much larger than in areas of specialization is consumed on the farm and grown for such purpose. Such farmers, while growing some wheat, may even find the balance of their interest on the consumer's side.

The effect of consumption of home-grown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop. Consumption on the farm where grown appears to vary in an amount greater than 20 per cent of average production. The total amount of wheat consumed as food varies but relatively little, and use as seed is relatively constant.

The maintenance by government regulation of a price for wheat undoubtedly can be accomplished as effectively by sustaining or increasing the demand as by limiting the supply. The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the

scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial. *Labor Board* v. *Fainblatt,* 306 U. S. 601, 606 *et seq.; United States* v. *Darby, supra,* at 123.

It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices.[28]  One of the primary purposes of the Act in question was to increase the market price of wheat, and to that end to limit the volume thereof that could affect the market.  It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions.  This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases.  But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market.  Home-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon.  This record leaves us in no doubt that Congress

---

[28] *Swift & Co.* v. *United States,* 196 U. S. 375; *Stafford* v. *Wallace,* 258 U. S. 495; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1; *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295; *United States* v. *Trenton Potteries Co.,* 273 U. S. 392; *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420; *Standard Oil Co. of Indiana* v. *United States,* 283 U. S. 163; *Currin* v. *Wallace,* 306 U. S. 1; *Mulford* v. *Smith,* 307 U. S. 38; *United States* v. *Rock Royal Co-operative, supra; United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381; *United States* v. *Darby, supra; United States* v. *Wrightwood Dairy Co., supra; Federal Power Commission* v. *Pipeline Co.,* 315 U. S. 575.

may properly have considered that wheat consumed on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices.

It is said, however, that this Act, forcing some farmers into the market to buy what they could provide for themselves, is an unfair promotion of the markets and prices of specializing wheat growers. It is of the essence of regulation that it lays a restraining hand on the self-interest of the regulated and that advantages from the regulation commonly fall to others. The conflicts of economic interest between the regulated and those who advantage by it are wisely left under our system to resolution by the Congress under its more flexible and responsible legislative process.[29] Such conflicts rarely lend themselves to judicial determination. And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do.

### III

The statute is also challenged as a deprivation of property without due process of law contrary to the Fifth Amendment, both because of its regulatory effect on the appellee and because of its alleged retroactive effect. The court below sustained the plea on the ground of forbidden retroactivity, "or in the alternative, that the equities of the case as shown by the record favor the plaintiff." 43 F. Supp. 1017, 1019. An Act of Congress is not to be refused application by the courts as arbitrary and capricious and forbidden by the Due Process Clause merely

---

[29] Cf. *M'Culloch* v. *Maryland*, 4 Wheat. 316, 413–415, 435–436; *Gibbons* v. *Ogden, supra,* at 197; *Stafford* v. *Wallace,* 258 U. S. 495, 521; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 37; *Helvering* v. *Gerhardt,* 304 U. S. 405, 412.

because it is deemed in a particular case to work an inequitable result.

Appellee's claim that the Act works a deprivation of due process even apart from its allegedly retroactive effect is not persuasive. Control of total supply, upon which the whole statutory plan is based, depends upon control of individual supply. Appellee's claim is not that his quota represented less than a fair share of the national quota, but that the Fifth Amendment requires that he be free from penalty for planting wheat and disposing of his crop as he sees fit.

We do not agree. In its effort to control total supply, the Government gave the farmer a choice which was, of course, designed to encourage coöperation and discourage non-coöperation. The farmer who planted within his allotment was in effect guaranteed a minimum return much above what his wheat would have brought if sold on a world market basis. Exemption from the applicability of quotas was made in favor of small producers.[30] The farmer who produced in excess of his quota might escape penalty by delivering his wheat to the Secretary, or by storing it with the privilege of sale without penalty in a later year to fill out his quota, or irrespective of quotas if they are no longer in effect, and he could obtain a loan of 60 per cent of the rate for coöperators, or about 59 cents a bushel, on so much of his wheat as would be subject to penalty if marketed.[31] Finally, he might make other disposition of his wheat, subject to the penalty. It is agreed

---

[30] Section 7 of the amendment of May 26, 1941 provided that a farm marketing quota should not be applicable to any farm on which the acreage planted to wheat is not in excess of fifteen acres. When the appellee planted his wheat the quota was inapplicable to any farm on which the normal production of the acreage planted to wheat was less than 200 bushels. § 335 (d) of the Agricultural Adjustment Act of 1938, as amended by 54 Stat. 232.

[31] §§ 6, 10 (c) of the amendment of May 26, 1941.

that as the result of the wheat programs he is able to market his wheat at a price "far above any world price based on the natural reaction of supply and demand." We can hardly find a denial of due process in these circumstances, particularly since it is even doubtful that appellee's burdens under the program outweigh his benefits. It is hardly lack of due process for the Government to regulate that which it subsidizes.

The amendment of May 26, 1941 is said to be invalidly retroactive in two respects: first, in that it increased the penalty from 15 cents to 49 cents a bushel; secondly, in that, by the new definition of "farm marketing excess," it subjected to the penalty wheat which had theretofore been subject to no penalty at all, i. e., wheat not "marketed" as defined in the Act.

It is not to be denied that between seed time and harvest important changes were made in the Act which affected the desirability and advantage of planting the excess acreage. The law as it stood when the appellee planted his crop made the quota for his farm the normal or the actual production of the acreage allotment, whichever was greater, plus any carry-over wheat that he could have marketed without penalty in the preceding marketing year.[32] The Act also provided that the farmer who, while quotas were in effect, marketed wheat in excess of the quota for the farm on which it was produced should be subject to a penalty of 15 cents a bushel on the excess so marketed.[33] Marketing of wheat was defined as including disposition "by feeding (in any form) to poultry or livestock which, or the products of which, are sold, bartered, or exchanged, . . ."[34] The amendment of May 26,

[32] § 335 (c) as amended July 26, 1939, 53 Stat. 1126, 7 U. S. C. § 1335 (c).

[33] § 339, 7 U. S. C. § 1339.

[34] § 301 (b) (6) (A), (B), as amended July 2, 1940, 54 Stat. 727, 7 U. S. C. § 1301 (b) (6) (A), (B).

1941, made before the appellee had harvested the growing crop, changed the quota and penalty provisions. The quota for each farm became the actual production of acreage planted to wheat, less the normal or the actual production, whichever was smaller, of any excess acreage.[35] Wheat in excess of this quota, known as the "farm-marketing excess" and declared by the amendment to be "regarded as available for marketing," was subjected to a penalty fixed at 50 per cent of the basic loan rate for coöperators,[36] or 49 cents, instead of the penalty of 15 cents which obtained at the time of planting. At the same time, there was authorized an increase in the amount of the loan which might be made to non-coöperators such as the appellee upon wheat which "would be subject to penalty if marketed" from about 34 cents per bushel to about 59 cents.[37] The entire crop was subjected by the amendment to a lien for the payment of the penalty.

The penalty provided by the amendment can be postponed or avoided only by storing the farm marketing excess according to regulations promulgated by the Secretary or by delivering it to him without compensation;

---

[35] By an amendment of December 26, 1941, 55 Stat. 872, effective as of May 26, 1941, it was provided that the farm marketing excess should not be larger than the amount by which the actual production exceeds the normal production of the farm wheat-acreage allotment, if the producer establishes such actual production to the satisfaction of the Secretary, provision being made for adjustment of the penalty in the event of a downward adjustment in the amount of the farm marketing excess.

[36] §§ 1, 2, 3 of the amendment of May 26, 1941.

[37] Section 302 (b) had provided for a loan to non-coöperators of 60% of the basic loan rate for coöperators, which in 1940 was 64¢. See United States Department of Agriculture Press Release, May 20, 1940. The same percentage was employed in § 10 (c) of the amendment of May 26, 1941, and the increase in the amount of the loan is the result of an increase in the basic loan rate effected by § 10 (a) of the amendment.

and the penalty is incurred and becomes due on threshing.[38] Thus the penalty was contingent upon an act which appellee committed not before but after the enactment of the statute, and had he chosen to cut his excess and cure it or feed it as hay, or to reap and feed it with the head and straw together, no penalty would have been demanded. Such manner of consumption is not uncommon. Only when he threshed and thereby made it a part of the bulk of wheat overhanging the market did he become subject to penalty. He has made no effort to show that the value of his excess wheat consumed without threshing was less than it would have been had it been threshed while subject to the statutory provisions in force at the time of planting. Concurrently with the increase in the amount of the penalty, Congress authorized a substantial increase in the amount of the loan which might be made to coöperators upon stored farm marketing excess wheat. That appellee is the worse off for the aggregate of this legislation does not appear; it only appears that, if he could get all that the Government gives and do nothing that the Government asks, he would be better off than this law allows. To deny him this is not to deny him due process of law. Cf. *Mulford* v. *Smith,* 307 U. S. 38.

*Reversed.*

---

[38] Wheat—507, § 728.251 (b), 6 Federal Register 2695, 2701.