BOWLES, Acting Administrator, Office of Price Administration, v. STAPLETON, Mayor, et al.

Civ. No. 664.

District Court, D. Colorado, Sitting at Denver.

Nov. 13, 1943.

Max D. Melville, J. Nelson Truitt, and Charles H. Haines, all of Denver, Colo., for plaintiff.

Kenneth W. Robinson, of Denver, Colo., Richard H. Simon, of Englewood, Colo., and Schaetzel & Knight, Malcolm Lindsey, Ernest B. Fowler, Paul M. Clark, Thomas E. Bowles, and Frank L. Hays, all of Denver, Colo., for defendants.

SYMES, District Judge (from the bench).

This is an action brought by the Acting Administrator of the Office of Price Administration against the Mayor of Denver and other city officers, and dealers in milk in Denver, particularly producers and dairymen, to restrain the enforcement of an ordinance recently passed by the City of Denver, known as Ordinance No. 50, Series of 1943.

The defendants have all filed answers, and by a motion to dismiss have raised the pertinent question of whether a cause of action is stated upon which the relief sought, to wit, an injunction can be granted. It is admitted that the plaintiff, pursuant to the War Emergency Price Control Act of 1941, P.L. 421, 56 Stat. 23, approved January 30, 1942, 50 U.S.C.A.Appendix, § 901 et seq., passed by the Congress pursuant to the war powers vested in the President and Congress, entitled "To Further the National Defense and Security by Checking Speculative and Excessive Price Rises, Price Dislocations, and Inflationary Tendencies, and For Other Purposes," has fixed ceiling prices for milk in Denver, to wit, the price to be paid by the ultimate consumer. These regulations have been in force for some time.

It seems that the defendant producers supplying milk for Denver have been very much dissatisfied with the ceiling prices on the ground that they are so low the regulations compel them to produce and sell their milk for consumption in Denver at a loss; that the price has never and especially does not today enable them to pay the increased cost of producing milk occasioned by the increased cost of labor, feed and other necessary expenses.

That within the month these milk dealers —whether they are acting in concert or not I do not attempt to say, because their conduct might lead to other serious consequences—have given notice through the public press and in other ways that they will not after November 1, 1943, furnish milk in the City and County of Denver at the prices so fixed by the Price Administrator. As a result of this notice and this threatened strike on behalf of the milk producers, negotiations of various kinds have been had between the city officials and the milk producers, as well as the local Regional Administrator and the Acting Administrator in Washington.

It evidently is the opinion of the local government officials here administering this law that these allegations in part at least were correct; that the milk producers were selling their milk at a loss due to increase in prices of their supplies, and that they could not be expected to carry on much longer. Mr. Collins, the Regional Administrator, in a letter dated October 6, 1943, to Mr. Bowles, the Senior Deputy Administrator in Washington, said: "We cannot ignore the acute problems of diversion of fluid milk and hay, the steadily mounting cost of all dairy feeding stuffs, the dwindling supplies of fluid milk."

It is further stated. and not denied, that these dealers have begun to dispose of their cows by slaughter, and are not replacing them with fresh cows, so that the supply of fluid milk is steadily decreasing. Finally, as a last resort, the City of Denver, through its duly constituted assembly or legislative body, the City Council, passed the ordinance referred to, which recites that the Council found that the practical operation of the low ceiling prices heretofore fixed by the Office of Price Administration has produced a situation in the City of Denver, local in character and extent, and that the threatened milk strike has created a grave emergency involving the health and lives of children and other persons in the City of Denver. It then passed the ordinance laying an excise tax of two cents per quart upon milk intended for human consumption in the City and County of Denver. By Section 4 it is made the "duty of every seller of milk at retail to collect the said excise tax and to remit the same to the Manager of Revenue of the City and County of Denver; and such Manager is hereby authorized to promulgate rules and regulations in regard to the collection of said tax, the form of records to be kept," etc. The ordinance (Section 5) says "That, in order to prevent a shortage of milk for human consumption in the City and County of Denver, the moneys to be raised by said excise tax are hereby appropriated for the purpose of paying the same to the producers of the milk being sold in Denver; and the Manager of Revenue is hereby authorized and instructed to pay the same to such producers of the milk, or

their duly authorized agents, pro rata in proportion to the quantities of milk produced by the various producers and sold for human consumption in Denver."

It then provides (Section 6) any person whose duty it is to collect the said tax and fails to do so or to comply with the rules and regulations in respect thereto shall be punished by a fine or jail, or both. The Government asks that the enforcement of that ordinance be restrained, and it is contended on behalf of the plaintiff that it is in direct violation of the said Emergency Price Control Act of 1942, and merely a device for getting around the price regulation fixed by the federal government.

That it may have that effect is, of course, quite apparent, because, brushing aside all other views, the net result of this ordinance, if enforced, and this money collected is paid back to the producers of milk, is to increase the price they get for their product and will enable them according to their advertisements and public announcements to continue in business. I think the court can take judicial notice of the fact that at no time have they asked for more than an increase of two cents a quart on the price of their product. If this were a direct conflict between a price regulation of the federal government and a price regulation of the City and County of Denver or the state, there could be no question but what the federal rule would govern, because the Constitution specifically provides (Article 6, cl. 2) the laws made by Congress pursuant to the constitutional powers vested in them are the supreme law of the land and binding upon everybody, both state and federal officers. But this is hardly a price-fixing device by the city. It is an excise tax, and it is not argued seriously that the City of Denver has not the right to lay and enforce such a tax.

In the case of Helena Rubinstein v. Charline's Cut Rate, Inc., 132 N.J.Eq. 254, 28 A.2d 113, decided September 11, 1942, the Vice-Chancellor laid down the rule, which would govern here if it were adaptable to the facts, where a conflict arises between a state so-called fair trade contract and regulations duly promulgated by the Federal Price Administrator, the regulations must control. A retailer may not be enjoined from selling at lower than minimum retail prices under the said act where his prices have been frozen by the general maximum price regulation. In other words, where there is a conflict between the state prices and the federal government prices, the federal government regulations control, and of that there can be no doubt.

The defendants call attention to what they claim is an exception to the general maximum price regulation of commodities issued April 28, 1942, as amended, and that is the subdivision marked (b) on page 11:77 of the regulations (Exhibit H). That language is as follows: "(b) As to a tax or increase in a tax which becomes effective after March 31, 1942. If the statute or ordinance imposing such tax or increase does not prohibit the seller from stating and collecting the tax or increase separately from the purchase price, and the seller does separately state it, the *seller may collect, in addition to the maximum price*, the amount of the tax or increase actually paid by him or an amount equal to the amount of tax paid by any prior vendor and separately stated and collected from the seller by the vendor from whom he purchased. Provided, however, That the tax on the transportation of all property (excepting coal) imposed by section 620 of the Revenue Act of 1942 [26 U.S.C.A.Int.Rev. Code, §§ 3471, 3475], shall, for the purposes of determining the applicable maximum price of any commodity or service, be treated as though it were an increase of 3% in the amount charged by every person engaged in the business of transporting property for hire. It shall not be treated as a tax for which a charge may be made in addition to the maximum price."

It is quite apparent that this provision anticipates and contemplates that this question of a local excise tax or a state tax may bob up in the course of the administration of this act. It provides that as to a tax or increase in a tax which becomes effective after March 31, 1942, if the statute or ordinance imposing such tax or increase does not prohibit the seller from stating and collecting the tax or the increase in a tax separately from the purchase price, and the seller does separately state it, the seller may collect, in addition to a maximum price, the amount of the tax or increase actually paid by him or an amount equal to the amount of the tax paid by any prior vendor and separately stated and collected from the seller by the vendor from whom he purchased. In other words, that means to my mind that where the provision uses the words "in addition to the maximum price," it means the maximum price fixed by the Administrator, and any tax in addition to that may be collected, and it is not

unlawful so to do. It seems to me that a local tax is thus anticipated and provision made for its collection similar to the state sales tax. We all know that the price of a suit of clothes may be fixed and I think has been fixed by the federal government, and that anyone purchasing a suit of clothes must pay that price. They must pay the price fixed by the Government on any other article sold, and the state sales tax, for instance, is ordinarily added to the price fixed by the federal government, and is collected by the seller. I cannot distinguish this city excise tax from the state sales tax. Therefore, where, as here, the seller of milk, the vendor of milk, is required to pay this tax over to the City of Denver after collecting it from the ultimate consumer, he is doing nothing more than acting as a collector of the tax the same as a store does in collecting the sales tax for the state.

■ Of course, this may be said to be just a device to get around the federal regulations, but if so it looks like a successful one. It is the duty of the court to recognize taxes of this nature in considering these maximum prices fixed by the federal government because the Government clearly has the power to denounce and prevent the collection of any such tax if it cares to. There are several cases recently decided by the Supreme Court, which have not been referred to here today, where the court points out that there are many fields of taxation or regulation open to both the federal government and the state, and that where the Government under its superior right has not stepped in and appropriated the field or regulated it the state may do so until the federal government makes its own regulations. When it does, its acts supersede any regulation made by the state government.

Parker v. Brown, 317 U.S. 341, at page 350, 63 S.Ct. 307, at page 313: "Occupation of a legislative 'field' by Congress in the exercise of a granted power is a familiar example of its constitutional power to suspend state laws."

And, page 351, of 317 U.S., page 313 of 63 S.Ct.: "The Sherman Act [15 U.S.C. A. §§ 1–7, 15 note] makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. * * * There is no suggestion of a purpose to restrain state action in the Act's legislative history."

Page 352 of 317 U.S., page 314 of 63 S.Ct.: The court points out that the state in adopting the pro rata rate program under discussion "imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit."

Page 353 of 317 U.S., page 314 of 63 S.Ct.: "We may assume also that a stabilization program adopted under the Agricultural Marketing Agreement Act would supersede the state act. *But the federal act becomes effective only if a program is ordered by the Secretary.*" (Emphasis ours.)

See, also, the discussion on page 354, of 317 U.S., 63 S.Ct. 307.

Page 362 of 317 U.S., page 319 of 63 S.Ct.: "When Congress has not asserted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved." Citing cases.

Page 367 of 317 U.S., page 321 of 63 S.Ct.: "This history shows clearly enough that the adoption of legislative measures to prevent the demoralization of the industry by stabilizing the marketing of the raisin crop is a matter of state as well as national concern and, in the absence of inconsistent Congressional action, is a problem whose solution is peculiarly within the province of the state."

See, also, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82.

If the Government here was exercised over this two cent tax it has the power by its regulations or by a further enactment of Congress to provide that this maximum price alone shall be what shall be paid by the ultimate consumer, and that no local tax can be added, and that the processor or dealer who deals with the commodity in its transition from the producer to the ultimate consumer may not increase in any way the price paid by the ultimate consumer. As I have pointed out, this situation seems to have been anticipated by Section (b) of the general maximum price regulation (supra). Furthermore, there is nothing in the so-called evasive clause, being Section 1351.-410, contrary to these views. That provides that: "The price limitations of this Regulation shall not be evaded by direct or indirect methods, by means of, or in connection with, any offer, solicitation, agreement,

340

sale, delivery, purchase, or receipt of or relating to 'milk', alone or in conjunction with any other commodities, or by way of, or in connection with, any commission, service, transportation, or other charge or discount, premium, or privilege, tying agreement, trade understanding, or change in any business or trade practice."

If they had intended that the ceiling price should not be evaded by the imposition of any local tax, it would be easy to say so, and the fact they have not done so is persuasive that they do not so intend. This ordinance of the city does nothing more than add another tax. Under the Twentieth Amendment to the State Constitution, all the powers of taxation vested in the State of Colorado, so far as they apply to or are exercised within the limits of the City and County of Denver, are granted to the city by that amendment. This excise tax is one of that class of taxes which exacts money from one particular class of the community and pays it over to another. Many instances of that kind have been cited, such as all the social security taxes, the old age pension taxes and other impositions laid upon the general public or sometimes a segment of the general population for the benefit of a particular class or group. There was some question as to whether those impositions are taxes, but the authorities today hold that they are taxes imposed on the theory of benefit to the public generally and that the money thus raised is used for some public purpose. It seems to me that the City and County of Denver under the laws and regulations as they stand today has the right if it wishes to levy this tax and compel its collection and then having collected it they have the right to pay it back to these milk producers in order to avert what, according to unanimous opinion, seems to be a very dangerous situation that threatens the life and welfare of its citizens. It is not necessary to say what would happen to this community if we were shut off from a supply of milk for any considerable time. I do not believe that Congress ever anticipated or intended that this law would result in such a situation in this or any other community of the country. If they did so intend, they had plenty of ways that they could have so stated in the law.

We recognize that the limits of the war power under our Constitution, Art. 1, Sec. 8, cl. 11, have not yet been fully explored by the legislative branch of our Government, but in the situation under discussion Congress has not yet seen fit to exercise those powers to the extent that the Price Administrator contends.

Furthermore, the equities of the case are all against the plaintiff. It is admitted by counsel that the ceiling price in Denver was fixed without any hearing or investigation of any kind to determine the cost of producing milk. It therefore follows that the ceiling price attempted to be enforced by the Administrator is arbitrary and capricious, and it is not alleged it can be, or is, sustained by any evidence or facts such as are required in fixing prices. As pointed out the situation has been called to the attention of the authorities in Washington by Mr. Collins, and the threat to the health and welfare of this community pointed out. But as far as this record goes no attempt has been made to meet the situation, or attempt made to show the ceiling prices are reasonable and justified.

■ Price fixing is an inherent power of the federal government and, as held in the Washington rent cases—Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165—a public emergency, such as the war, will justify the Legislature in restricting property rights in prices to a certain extent without compensation. And a limit in time to tide over a passing trouble may well justify a law that could not be upheld as a permanent change.

And as Justice Brandeis said in his dissenting opinion in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, at page 417, 43 S.Ct. 158, at page 161, 67 L.Ed. 322, 28 A.L.R. 1321: "Every restriction upon the use of property imposed in the exercise of the police power deprives the owner of some right theretofore enjoyed, and is, in that sense, an abridgement by the state of rights in property without making compensation. But restriction imposed to protect the public health, safety or morals from dangers threatened is not a taking."

■ The federal government, having failed to act upon reasonable notice of the acute situation existing, cannot in equity complain of action taken by the local communities for the protection of the health of its children, invalids and citizens in general. It is a condition and not a theory that confronts us.

■ And, finally, the ceiling price fixed by the Government on the milk is the "price" at which milk will still be sold under the ordinance in question. Price is the amount paid by the purchaser and it can-

not be diminished by the amount of any tax. Elmer Candy Co. v. Fauntleroy, Collector, D.C., 19 F.2d 664.

It follows, therefore, that the motion to dismiss will be granted.

It will be necessary for you to prepare some findings of fact and conclusions of law.