**UNITED STATES of America**

v.

**Helard J. Gonzales O'HIGGINS, Defendant.**

**No. 98 CR. 358(RPP).**

United States District Court, S.D. New York.

Oct. 6, 1998.

---

Mary Jo White, United States Attorney for the Southern District of New York, New York, NY, by Alex Young K. Oh.

Leonard F. Joy, The Legal Aid Society, Federal Defender Division, New York, NY, by Steven M. Statsinger, for Defendant.

## OPINION

ROBERT P. PATTERSON, JR., District Judge.

Defendant Helard J. Gonzales O'Higgins moves to dismiss Counts Two through Six of the indictment against him. Each of these counts charges the Defendant with a theft of an "object of cultural heritage" from the Music Division of the New York Public Library for the Performing Arts in New York, New York, in violation of Title 18, United States Code, Sections 668 and 2.[1] Each item is alleged to be over 100 years old and to have a value of over $5000.[2]

Defense counsel acknowledged in his papers and during oral argument that the Government can prove that the activities

---

**1.** 18 U.S.C. § 668 provides:

(a) Definitions:
In this section—
  (1) "museum" means an organized and permanent institution, the activities of which affect interstate commerce, that—
    (A) is situated in the United States;
    (B) is established for an essentially educational or aesthetic purpose;
    (C) has a professional staff; and
    (D) owns, utilizes, and cares for tangible objects that are exhibited to the public on a regular schedule.
  (2) "object of cultural heritage" means an object that is—
    (A) over 100 years old and worth in excess of $5000; or
    (B) worth at least $100,000.
(b) Offenses
A person who—
  (1) steals or obtains by fraud from the care, custody, or control of a museum any object of cultural heritage; or
  (2) knowing that an object of cultural heritage has been stolen or obtained by fraud, if in fact the object was stolen or obtained from the care, custody, or control of a museum (whether or not that fact is known to the person), receives, conceals, exhibits, or disposes of the object.
shall be fined under this title, imprisoned not more than 10 years, or both.
  18 U.S.C. § 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.

**2.** The items include one leaf from a piano minuet by Wolfgang Amadeus Mozart, signed by the composer, with an estimated value of $50,000, and an essay and three letters by Richard Wagner.

of the New York Public Library for the Performing Arts do affect interstate and foreign commerce. Defendant contends, however, that § 668 is unconstitutional because Congress exceeded its power to legislate under the Commerce Clause.[3] The Defendant relies on the Supreme Court opinion in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

*Lopez* invalidated 18 U.S.C. § 922(q), which prohibited the possession of a firearm in a school zone. In *Lopez* the Supreme Court said that § 922(q), by its terms, "has nothing to do with 'commerce' or any sort of economic enterprise" and that the statute cannot be "sustained under . . . cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 1630–31. The Court identified three categories of activity that Congress may regulate under its Commerce Clause power.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may only come from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 1629 (citations omitted). Here only the third category of activity is relevant, since § 668 criminalizes the stealing of objects of cultural heritage from a museum, which by definition must be an institution whose activities affect interstate commerce.

■ Within this third category, the Supreme Court noted two ways in which a Congressional Act may pass the substantial effects test. *U.S. v. Goodwin,* 141 F.3d 394, 398 (2d Cir.1997). First, laws which regulate intrastate economic activity do not offend the Commerce Clause where "the activity substantially affect[s] interstate commerce." *Lopez,* 115 S.Ct. at 1630. Second, criminal statutes which contain a jurisdictional element that ensures, through case-by-case inquiry, that the regulated activity affects interstate commerce are constitutional. *Id.* at 1631; *U.S. v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). Section 668 satisfies the substantial effects test in both ways.

■ A rational basis exists for concluding that the theft of major works of art, in the aggregate, substantially affects interstate economic activity. *Lopez,* 115 S.Ct. at 1629 (holding "rational basis" as standard for Commerce Clause inquiries). Though *Lopez* can be read as calling the aggregation principle into some doubt, a more accurate interpretation will appreciate the distinction the Court drew between statutes such as § 922(q), struck down in *Lopez,* and regulations such as that upheld in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Section 922(q) prohibited the mere possession of a firearm within a certain zone; the law did not implicate guns as articles in commerce. Here, the theft of objects of cultural heritage, as the Government points out, has a substantial impact on the national economy, even if the thefts perpetrated by this particular defendant had only a de minimis effect. *Wickard,* 317 U.S. at 127–28, 63 S.Ct. 82. *See* L. Hsieh, J. McCarthy, and E. Monkus, *Intellectual Property Crimes,* 35 Am.Crim. L.Rev. 899, 929–37 (1998); *Police Agencies Put a $3B Art "Collection" Online,* Times Union (Albany), Sept. 2, 1998 at D8.

Art thieves generally do not pursue their bounty so as to hang it on their own

---

**3.** Article 1, Section 8, of the Constitution provides: "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

living room walls; rather, they aim to resell the works. This affects the price of art not just in the state in which a given letter or manuscript was stolen, but it has an impact across state lines and around the world. It also increases the cost of insurance. Although theft itself is not a commercial activity, § 668 as a whole is directed toward interstate commerce by reducing traffic in objects of cultural heritage stolen from museums whose activities affect interstate commerce. *U.S. v. Windley,* 1997 WL 431129 at *2 (S.D.N.Y.1997). Congress rationally could conclude that criminalizing the theft of objects of cultural heritage from museums will reduce interstate trafficking in stolen art and thus is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* (quoting *Lopez,* 115 S.Ct. at 1631). *See also U.S. v. Franklyn,* 1998 WL 603237 (2d Cir.1998) (holding 18 U.S.C. § 922(*o* ) a valid exercise of Congressional power under Commerce Clause).

Moreover, the definition of "museum" in § 668 satisfies the jurisdictional requirement as described by the Court in *Lopez.* The statute defines "museum" as "an organized and permanent institution, the activities of which affect interstate commerce that (A) is situated in the United States; (B) is established for an essentially educational or aesthetic purpose; (C) has a professional staff; and (D) owns, utilizes, and cares for tangible objects that are exhibited to the public on a regular schedule." Common sense suggests that stealing objects of cultural heritage from a museum significantly impacts the institution's mission. As the museum's activities affect interstate commerce, thefts from the museum do so as well.

The Defendant argues that *Lopez* requires more than that the statute mention the phrase "affects interstate commerce" and contends that, to be validly prohibited, a defendant's own conduct must be in the realm of interstate commerce. (Def. Rep. Mem. at 3.) But that is not how the Second Circuit has read *Lopez.* In *U.S. v. Goodwin,* 141 F.3d 394 (2d Cir.1997), the Second Circuit upheld the constitutionality of 18 U.S.C. § 1956, the money laundering statute, in the face of a *Lopez* challenge. Section 1956 prohibited financial transactions involving the proceeds of unlawful activity; "financial transaction" was defined as:

> (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

18 U.S.C. § 1956(c)(4). Pointing to this language, the court said, "The inclusion of these jurisdictional elements precludes any serious challenge to the constitutionality of the money laundering statute as beyond the Commerce power, because it guarantees a legitimate nexus with interstate commerce." *Goodwin,* 141 F.3d at 399–400 (citations and internal quotations omitted).

Similarly, in *U.S. v. Torres,* the Second Circuit upheld part of the racketeering statute, 18 U.S.C. § 1959, against constitutional challenge. Section 1959 prohibits the commission of a violent crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). "Enterprise" is defined as any legal or non-legal entity "which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). In two sentences the court disposed of the defendant's facial constitutional challenge, saying, "Section 1959 satisfies the substantial effect requirement. Section 1959 incorpo-

rates a jurisdictional element requiring a nexus between the offense in question and interstate commerce." *Torres*, 129 F.3d at 717. The language in § 668 is extremely close to that of both § 1956(c)(4)(B) and § 1959(b)(2), as § 668 defines a museum as an institution whose activities affect interstate commerce. Thus, this Court finds that the jurisdictional requirement contemplated by *Lopez* is met in § 668 and the statute does not offend the Commerce Clause.[4]

■ The Defendant has asked the Court to rule a Congressionally enacted statute unconstitutional on its face. Such a task is not undertaken lightly. *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (plurality opinion). For a facial challenge to be successful, the challenger must establish that no set of circumstances exists under which the challenged statute would be valid. *U.S. v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Davidson v. Mann*, 129 F.3d 700, 701 (2d Cir.1997). Recent cases before this Court have involved the

possession and attempted sale in the United States of many valuable works of art stolen from museums. *See e.g. U.S. v. Koga*, No. 97 Cr. 930 (S.D.N.Y. filed Sept. 17, 1997) (RPP). The Isabella Stewart Gardner Museum in Boston and the Peabody Museum in Salem, Massachusetts, are among two of the better known institutions victimized by art thieves in the 1990's. There can be no doubt that the theft of a world famous Rembrandt would substantially affect interstate commerce through its impact on the value of other works of art and the cost of insurance.

For the reasons cited herein, the Defendant's motion to dismiss is denied.

IT IS SO ORDERED.

---

4. It is unfortunate that the Supreme Court, with *Lopez*, has encouraged such reflexive, formalistic applications of the law. Judge Pollak has written:

> *Bass* reserved the question whether, upon appropriate findings, Congress can constitutionally punish the mere possession of firearms. *Lopez* may be thought to stand for the proposition that the answer to that question is "no." Or *Lopez* may be thought to hold that section 922(q) is invalid because Congress did not make appropriate findings-indeed, made none. Whichever reading of Lopez one chooses, the escape route-the "nexus"-is there for the asking. The Chief Justice's opinion for the Court beckons in that direction. The concurring opinion of Justice Kennedy, while noting the tendency of section 922(q) to displace state regulation in areas of traditional state concern, offers no basis for concluding that he and Justice O'Connor have reservations about the Chief Justice's jurisdictional element analysis. Apart from Justice Thomas, whose concurrence voices his doubts about the entire "substantially affects commerce" jurisprudence, there appears to be no member of the Court who would resist a legislative face-lift of section 922(q) that added a

"nexus" requiring that firearms subject to the statute have traveled in commerce. The case of establishing such a connection to commerce is illustrated by *Lopez* itself, for, as the Fifth Circuit noted, the parties stipulated that a [Bureau of Alcohol, Tobacco, and Firearms] agent could testify to the out-of-state provenance of the gun that Alfonso Lopez brought to school. The commerce "nexus" may be seen as a "jurisdictional element" responsive to the scope and defined boundaries of Article I, Section 8, Clause 3 of the Constitution. Or it may be seen as just a lawyer's gimmick.

L. Pollak, *Reflections on* United States v. Lopez, 94 Mich. L.Rev. 533, 549–50 (1995) (citations and internal quotations omitted). Indeed, soon after *Lopez*, Congress amended 922(q). Pub.L. 104–208, § 101(f). Whereas previously subsection (2)(A) read, "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone," the 1996 amendment read, "It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone."