STAHL, Circuit Judge,
concurring, joined by TORRUELLA, Circuit Judge.
I join this opinion with great reluctance. I do so because Chevron deference requires the result reached here, not that the result makes economic or realistic sense.
Here, we have the last full-line precision tool company producing its product within the United States. Although Starrett has several manufacturing locations worldwide, the Athol location produces most of the precision tools and has remained the company’s headquarters since its founding in 1880. Starrett is the largest employer in the greater Athol area, and its payroll typically contributes over $2 million per month to the economy.
In order to remain competitive in the global marketplace, Starrett has aggressively sought to lower its cost structures and has instituted many energy conservation measures, which have both saved operating costs and reduced the company’s carbon footprint. One of these measures included the replacement of the failed left turbine generator with a new, energy-efficient generator, the source of controversy in this case.
Innovations like those taken by Starrett are a necessary concomitant if we are to reinvigorate the nation’s manufacturing base. Our decision today, however, may well mean that this company loses the economic advantage it would have from its low-cost, nonpolluting power structure. Cost-saving measures like those instituted by Starrett are particularly key for companies based in high energy cost states, like Massachusetts, and may well make the difference in keeping the plant open, providing good paying jobs, and maintaining an essential business such as this in our country. Indeed, machine tools are the lifeblood of industry, and when we have lost all of our domestic capacity, we become less secure and less able to compete. It is said by some that American industry has died from a thousand cuts, and many contend that over-regulation bears a share of the responsibility.
Further, it is unfortunate that a small power producer like the Starrett facility falls within the ambit of the Commission’s jurisdiction because it is located on a non-navigable stream that is a tributary to a *30 navigable water and affects interstate commerce through its connection to the interstate grid. Although I acknowledge that Wickard v. Filbwm, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and its progeny give the Commission power to reach purely local activity, the result strikes me as ironic. In Wickard, the government was confronted with a surplus of wheat, and it regulated production to avoid dramatically low wheat prices around the country. The market at issue here, however, proves just the opposite. Today, rising energy prices and a diminishing supply of resources pose a real challenge, and our national and state governments are doing all that they can to promote energy efficiency in order to lower energy costs. It would seem that Starrett’s Project is a prime example of efficient usage through a nonpolluting power source and is one that we should be encouraging, not stifling.
Perhaps a better argument not advanced by Starrett would have been that, although Chevron applies, the Commission’s definition of posW1935 construction was unreasonable in view of the realities presented by this project. Defining construction to include any increase in capacity still less than that originally authorized, without a de minimis exception and without consideration of a project’s increased efficiency and economic impact, strikes me as troubling. But Starrett did not make this point, nor was there evidence of the costs it would incur in seeking the Commission’s licensing and whether those costs and the necessary delay would take away from the project’s economic advantages. We must deal with the record we have.