**UNITED STATES of America,
Plaintiff,**

v.

**G. G. BONDERER, Defendant.
No. 238.**

United States District Court
W. D. Missouri, W. D.
March 26, 1956.

14. See note 6.

Edward L. Scheufler, Dist. Atty., by O. J. Taylor, Asst. Dist. Atty., Kansas City, Mo., for plaintiff.

J. P. Morgan, Chillicothe, Mo., for defendant.

DUNCAN, Chief Judge.

The United States instituted this suit to recover from defendant the sum of $241.70 as a wheat marketing quota penalty for the year 1954. The complaint recites that the action is brought under the direction of the Attorney General, and at the request of the Secretary of Agriculture, under the provisions of the Agricultural Adjustment Act of 1938, as amended and supplemented, 7 U.S.C.A. §§ 1281 to 1393; Act of January 30, 1954, 68 Stat. 4, and Act of August 28, 1954, 68 Stat. 897. Jurisdiction of the court vests under the provisions of Section 376 of the Act, 7 U.S.C.A. § 1376, and under 28 U.S.C. § 1345.

The defendant has filed an Answer which, after admitting and denying certain allegations of the Complaint, attacks the constitutionality of the regulations set out in the plaintiff's complaint, insofar as those regulations apply to the defendant, on the ground that "he was denied and refused the right to vote in all elections held by plaintiff in connection with said regulations and controls, and that said regulations provided that this defendant could not vote in said elections because of the acreage allotment arbitrarily set up for him by plaintiff and its representatives."

As an additional defense, the defendant states in his answer that his farm is located in a drought area, as determined by the plaintiff for the years 1953 and 1954, and that the Secretary of Agriculture published and allowed newspapers to publish and quote from his statements to the effect that farmers residing in said drought areas could plant and harvest wheat in amounts exceeding their quota for sale purposes, provided that said excess acreage was used by the individual farmer as feed for his own livestock on his own property to supplement the lack of pastures and other feed products for such livestock, and that in reliance upon such statements, the defendant did exceed his acreage allotment and used wheat grown in excess of his allotment for his personal use, and for feed for cattle on his own property.

Following the filing of the Answer plaintiff propounded interrogatories to the defendant, and following the answering of such interrogatories, the plaintiff filed a Motion for Summary Judgment, together with suggestions in support thereof. No suggestions in opposition thereto have been filed by the defendant. Apparently he does not intend to do so, the time for such filing under local rules having now expired.

From the admissions made by the defendant in his answer to the complaint, and in his answers to plaintiff's interrogatories, the following material facts may be taken as established * * * wheat was planted for harvest in 1954 on defendant's farm in Livingston County, Missouri. Defendant as the owner was entitled to all of such crop. The Livingston County Agricultural Conservation and Stabilization Committee established a wheat acreage allotment of 12 acres for defendant's farm. Written notice of such allotment was given to the defendant by the County Committee. Defendant did not apply for a review of such allotment as he might have done under the regulations (7 C.F.R. 728.465, 19 F.R. 202.)

Thereafter the County Committee determined with respect to the 1954 wheat crop on defendant's farm that the actual acreage of wheat was 25 acres; that the wheat acreage allotment was 12 acres, and that therefore, the excess acreage was 13 acres; that the normal yield per acre in that area was 16.6 bushels, resulting in a normal production for the acreage allotment of 199.2 bushels, and a farm marketing excess of wheat of 215.8 bushels.

The Complaint alleges that the County Committee gave defendant written notice of such determination of facts; the defendant states that he does not recall receiving such notice, but also states that he does not deny receiving the same. The uncontradicted affidavits of the chairman and the office manager of the County Committee sufficiently establish that such notice was, in fact, mailed to the defendant. It is also admitted that the defendant did not thereafter apply for a downward adjustment of the farm marketing excess, nor did he apply for a review by a reviewing committee of any of the above determinations of fact, as he was entitled to do under 7 U.S.C.A. §§ 1340 and 1363, and under 7 C.F.R. 728.-461 and 728.465.

The wheat planted on defendant's farm was harvested during the year 1954 and all of the wheat so harvested was fed on defendant's farm to livestock owned by him, none being marketed or otherwise disposed of. The rate of penalty, $1.12 per bushel, is provided for in 7 U.S.C.A. § 1340(2) and 7 C.F.R. 728.475.

In view of the foregoing, it would appear that there is no genuine issue as to any material fact, and that only questions of law now remain to be determined.

As to the allegation in defendant's answer that he was not permitted to vote, an additional assertion is found in a letter from counsel for defendant, addressed to the United States Attorney, in which he states that he does not desire to file a memorandum, but uses the following language as to the interpretation of the rule allowing participants to vote:

"It should be pointed out, however, that your interpretation of the rule as to who was allowed to vote in the local elections does not agree with the practice of the local offices. Your suggestions indicate that a farmer such as the defendant with an allotment below fifteen acres could have voted by declaring his intent to plant more than the fifteen acres. In actual practice the allotment was already known and those with allotments of less than fifteen acres were advised that they had no right to vote, and if they did insist their ballots were openly set aside from the ballots of those voting and having an allotment of fifteen acres or more. This denial of voting privilege is the only feature creating all of the resentment of the defendant and others in similar positions."

The Act of July 14, 1953, 67 Stat. 152, provided that the referendum with respect to the 1954 wheat crop could be held as late as August 15, 1953. On July 18, 1953, the Federal Register (18 F.R. 4221) contained a notice which provides in part as follows:

"The Secretary of Agriculture has duly proclaimed, pursuant to the provisions of the Agricultural Adjustment Act of 1938, as amended, a national marketing quota for wheat for the marketing year beginning July 1, 1954. A referendum of farmers who will be engaged in the production of the 1954 crop of wheat will be held pursuant to the provisions of the Agricultural Adjustment Act of 1938, as amended, and applicable regulations to determine whether such farmers are in favor of or opposed to such wheat marketing quota.

"Registration. The operator of each farm on which more than 15 acres of wheat will be planted for harvest in 1954 should inform a member of the county or community committee of the names and addresses of all producers who will share in the proceeds of such crop in order that their names may be listed on the register of eligible voters. The eligibility to vote of any person may be challenged if his name is not recorded on the registration list.

"Eligibility to vote. Each farmer who is engaged in the production of wheat for harvest in 1954 on a farm on which the acreage to be planted to wheat for harvest in 1954 is in excess of 15 acres and who is entitled to share in the proceeds of the 1954 wheat crop as owner, landlord (other than a landlord of a standing rent, cash rent or fixed rent tenant), tenant, or share-cropper shall be eligible to vote."

It will thus be seen that under the regulations, those farmers who have not had a wheat allotment in excess of 15 acres, are not eligible to vote unless they intend to plant more than 15 acres. If a farmer has such an intention, then he is entitled to vote, regardless of his allotment. As a matter of fact, the 1954 quotas could not have had any validity until after the referendum in 1953, since that referendum determined whether or not the national marketing quotas applied for the marketing year beginning July 1, 1954.

■ The defendant admits that he did not advise the County Committee of his intention to raise more than 15 acres of wheat. If defendant had complied with the regulations, he would certainly have been entitled to vote, and if the County Committee had arbitrarily refused to allow him to vote, he could, by proper action, have compelled the Committee to permit him to vote. However, he admittedly failed to advise the Committee of his intention, thus, the fact that he did not vote, or that the Committee did not permit him to vote, will not vitiate the allotment, or the consequences thereof under the Act and Regulations issued pursuant thereto.

The Regulations provide for a two-thirds majority of those producers voting in order to make the program effective. 18 F.R. 5707 showed a total of

447,757 producers voting, with 390,221 voting in favor of the wheat marketing quotas. It will thus be seen that the failure of the defendant to vote or to be permitted to vote, would not have affected the outcome of the referendum. To hold otherwise would be the equivalent of saying that one who had not been permitted to vote in an election, or who had not voted in an election, would be excused from complying with the law. Such a conclusion would, of course, be ridiculous. A somewhat similar point was ruled adversely to defendant's contention in United States v. Rock Royal Cooperative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. In addition, it should be noted that no provision is made in the act for any review, either by a committee or by a court, with respect to the referendum.

The defendant further complains in his answer to the interrogatories * * * and I say very frankly that his complaint is not without justification * * * that he and others relied upon published statements of the Secretary of Agriculture appearing in public print, and upon letters from senators and congressmen concerning the question of increasing the allotment for the purpose of producing feed in drought areas.

■■ The court will take judicial notice of the fact that during the time in controversy herein, there was a severe drought in the area in which the defendant resides, and that feed for livestock presented a serious problem. However, since the court is bound by the law, it must be taken as written and interpreted accordingly. The court did not make the law, and the court cannot repeal it. It must be realized that the Secretary of Agriculture and other high public officials cannot set aside or avoid the consequences of the Acts of Congress except in the manner provided in such Acts. See Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122. Thus, even though defendant may well have relied upon statements made by the Secretary, or other public officials, such reliance will not serve as a defense to this action.

It was clearly the avowed intention of the Agricultural Adjustment Act, as amended, to control surplus agricultural commodities and the prices thereof. Without a clear analysis and full understanding of the purposes underlying the Act, it might seem that a farmer could, without penalty, grow grain on his own farm in excess of his marketing quota, and consume it, or feed it to his own livestock. The answer to that, of course, is that such latitude in the enforcement of the Act would not bring about the purpose for which the Act was passed * * * that is, to control surplus.

■ It is natural to assume that if the farmer did not have such surplus grain to feed to his livestock, he would have to go into the market and acquire it, and to that extent consume or reduce the national surplus. It was held in Wickard v. Filburn, supra, that such consumption would have an effect on interstate commerce, and that therefore, the Act extends to those raising and using wheat as did the defendant in this case. Whether such a program is desirable and economically sound, is a matter that this court cannot determine. That is a legislative problem and not a judicial function.

■ The defendant may not now be heard to complain of his allotment of 12 acres fixed by the Committee, since he did not exhaust his administrative remedies as provided by law. It is provided in 7 U.S.C.A. § 1363:

"§ 1363. Review of quota; review committee. Any farmer who is dissatisfied with his farm marketing quota may, within fifteen days after mailing to him of notice as provided in section 1362 of this title, have such quota reviewed by a local review committee composed of three farmers from the same or nearby counties appointed by the Secretary. Such committee shall not include any member of the local committee

which determined the farm acreage allotment, the normal yield, or the farm marketing quota for such farm. Unless application for review is made within such period, the original determination of the farm marketing quota shall be final."

Also, under Regulations issued by the Secretary of Agriculture under authority of 7 U.S.C.A. § 1375, (7 C.F.R. 728.-465, 19 F.R. 202) the following procedure for a review is set forth:

"Section 728.465. Review of Quotas—(a) Right to Review by Review Committee. Any producer who is dissatisfied with the farm acreage allotment, normal yield, farm marketing quota, farm marketing excess, or other determination for his farm in connection with marketing quotas may, within 15 calendar days after the notice thereof was mailed to him, apply in writing for a review by a review committee of such acreage allotment, normal yield, farm marketing quota, farm marketing excess or other determination in connection therewith. Unless application for review is made within such period, the acreage allotment, normal yield, farm marketing quota, farm marketing excess, or other determination, as the case may be, shall be final as to the producers on the farm. Application for review and the review committee proceedings shall be in accordance with the review regulations (Form MQ–51) as issued by the Secretary (Part 711 of this chapter).

(b) Court Review. If the producer is dissatisfied with the determination of the review committee, he may, within 15 days after notice of such determination is mailed to him by registered mail, institute proceedings against the review committee to have the determination of the review committee reviewed by a court in accordance with section 365 of the act."

A review by a review committee of the farm marketing quota, as defined in 7 U.S.C.A. § 1340, would also provide a review of all of the pertinent facts determined by the County Committee. Not having sought a review of the allotment, or of the farm marketing excess of wheat, the defendant has clearly failed to exhaust the administrative remedies provided in the Act and Regulations, and he is therefore, barred from now making any contention that the action of the County Committee was improper. The court is entirely without legal power to grant any relief to the defendant or others similarly situated. Such relief could only come from the legislative branch of the Government.

The amount of the penalty may be computed by multiplying the penalty of $1.12 per bushel by the farm marketing excess of 215.8 bushels. The result is $241.70, as prayed for in the Complaint.

Plaintiff's Motion for Summary Judgment is therefore hereby sustained.

It Is Therefore Ordered, Adjudged and Decreed by the Court, that the plaintiff have and recover of and from the defendant, the sum of $241.70 and its costs herein expended.