UNITED STATES of America,
Plaintiff,

v.

Oscar WATKINS, Defendant.

Civ. A. No. 3243.

United States District Court
E. D. Arkansas, W. D.

Jan. 17, 1957.

Osro Cobb, U. S. Atty., Ralph M. Sloan, Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

Lonzo A. Ross, Conway, Ark., for defendant.

LEMLEY, District Judge.

This cause is before the Court upon the plaintiff's motion for summary judgment and the defendant's response thereto, which response amounts to a cross motion for summary judgment in his favor. Said motions have been submitted upon the pleadings, certain affidavits, and written briefs, from a consideration of which we are of the opinion that the case presents no genuine factual issues, and that the plaintiff is entitled to judgment as a matter of law. Rule 56, F.R. Civ.P., 28 U.S.C.A.

The plaintiff brought this action to recover from the defendant the sum of $185.85 plus interest as a penalty due from the defendant on account of his having produced on his farm in Faulkner County, Arkansas in 1955, a year with respect to which cotton marketing quotas were in effect under the provisions of the Agricultural Adjustment Act of 1938, as amended,[1] seven acres of cotton without having an acreage allotment therefor. The relevant facts in the case are as follows:

The defendant operates a 132½ acre farm in Faulkner County which farm, as indicated, had no cotton acreage allotment for 1955; notwithstanding this fact, the defendant planted seven acres of cotton thereon and carried it to maturity. On August 5, 1955 the Agricultural Stabilization and Conservation Committee of Faulkner County, Arkansas, which was, in accordance with the statute and pertinent regulations, administering the cotton program in that County, determined that the defendant's allotted cotton acreage was zero, that he had planted 8.5 acres of cotton, and that his excess acreage amounted to 8.5 acres. On September 15, 1955 defendant's cotton was re-measured, and it was determined that he had only 7 acres in cotton; it was further determined that the normal yield of this acreage was 150 pounds of lint cotton per acre, that the defendant's "farm marketing excess" was 1050 pounds of lint cotton, which would be subject to a penalty of $185.85. The defendant was notified of these determinations, and was advised that he should dispose of his excess acreage within a certain period of time and that if he did not do so he would be subject to a penalty on his "farm marketing excess" at the rate of 50% of the parity price of cotton on June 15, 1956; he was also advised of his rights of administrative review of the determinations that have been mentioned.[2] The defendant sought no review of the actions of the County Committee and took no steps to destroy his cotton acreage; on the other hand, at some undisclosed time between September 15 and December 6, 1955 he picked three or four hundred pounds of cotton, which he poured out on the ground at the ends of the rows; he then turned his cattle into the field and permitted them to eat not only the cotton that had been picked but also the cotton that was still attached to the stalks.[3]

---

1. 7 U.S.C.A. § 1281 et seq.

2. Those determinations were made pursuant to regulations published in the Federal Register for June 9, 1955, under the title "Cotton Marketing Quota Regulations for the 1955 Crop of Upland Cotton." Pertinent portions of those regulations and of the statute will be hereinafter set forth.

3. In an affidavit filed in opposition to the plaintiff's motion the defendant stated: "That during the calendar year 1955, I resided on Route 1, Vilonia, Arkansas; that I owned during the calendar year 1955 a 132½ acre farm; that the local A.S.C. office failed and refused to allow me any cotton acreage; that I did plant 7 acres of cotton, but the cotton produced on the 7 acres was never harvested or placed on the market for sale. After the cotton had opened, I picked some 300 or 400 lbs. of cotton and poured it out in the field at the end of the rows. It was never hauled to the house, taken to the gin or offered for sale in the seed. The balance of the cotton was left in the field and never picked. No part of my cotton crop was actually harvested and placed in the barn nor offered for sale." For purposes of passing on the said motion we accept as true the factual statements contained in this affidavit; of course, we do not necessarily accept any mere conclusions therein expressed.

Thereafter, demand was made on the defendant for the penalty on his "farm marketing excess," and such demand having been refused, this suit followed.

■ In resisting the demand of the plaintiff the defendant does not challenge the administrative determinations of the County Committee relative to his excess acreage, or to his farm marketing excess, nor does he question the calculations by which the amount of penalty was determined. He does contend, however, that he did not harvest or market any cotton produced on his land, and for that reason is not subject to penalty. In answer to that contention the plaintiff asserts that not having disposed of his cotton acreage within the time prescribed by the regulations he is liable for the penalty regardless of whether he harvested or marketed any of the cotton or not; and it contends, further, in the alternative that it appears affirmatively and without question from his affidavit that has been mentioned and from a written statement that he gave to a representative of the County Committee on December 6, 1955,[4] that he did harvest a substantial portion of his crop, and that having done so, he became liable for the entire penalty.

In order to correctly determine these conflicting contentions it is necessary to consider the governing statutory and regulatory provisions:

7 U.S.C.A. § 1345 provides that: "The farm marketing quota for any crop of cotton shall be the actual production of the acreage planted to cotton on the farm less the farm marketing excess. The farm marketing excess shall be the normal production of that acreage planted to cotton on the farm which is in excess of the farm acreage allotment: Provided, That such farm marketing excess shall not be larger than the amount by which the actual production of cotton on the farm exceeds the normal production of the farm acreage allotment, if the producer establishes such actual production to the satisfaction of the Secretary."

Section 1346 of the same Title is as follows:

"(a) Whenever farm marketing quotas are in effect with respect to any crop of cotton, the producer shall be subject to a penalty on *the farm marketing excess* at a rate per pound equal to 50 per centum of the parity price per pound for cotton as of June 15 of the calendar year in which such crop is produced.

"(b) The farm marketing excess of cotton *shall be regarded as available for marketing* and the amount of penalty shall be computed upon *the normal production of the acreage on the farm planted to cotton in excess of the farm acreage allotment.* If a downward adjustment in the amount of the farm marketing excess is made pursuant to the proviso in section 1345 of this title, the difference between the amount of the penalty computed upon the farm marketing excess before such adjustment and as computed upon the adjusted farm marketing excess shall be returned to or allowed the producer.

"(c) The person liable for payment or collection of the penalty shall be liable also for interest thereon at the rate of 6 per centum per annum from the date the penalty became due until the date of payment of such penalty.

"(d) Until the penalty on the farm marketing excess is paid, all cotton produced on the farm and marketed by the producers shall be subject to the penalty provided by

---

4. That statement, which is attached to the motion for summary judgment, reads as follows: "This is to advise that I have harvested approximately 400 pounds of cotton on my farm in 1955, but I have not sold any of this cotton. I let my cattle in on my cotton and let them eat what I had harvested and what was still on the stalk. I decided that I could make more by picking cotton for my neighbor than I could by picking my cotton and paying the penalty * * *."

this section and a lien on the entire crop of cotton produced on the farm shall be in effect in favor of the United States." (Emphasis supplied.)

Subsections (a) and (b) of Section 722.646 of the Regulations provide for the measurement of farms and the determination of excess cotton acreage; subsection (c) of that Section provides for notice of such measurement and determination to be given to the producer and that he be called upon to adjust his actual acreage of cotton to the allotted acreage within the prescribed time; that subsection then goes on to specifically provide that, "No cotton acreage shall be disposed of for purposes of adjusting the planted acreage of cotton to the farm acreage allotment after any cotton has been harvested from such planted acreage."

Section 722.650 of the Regulations is in substantially the same language as 7 U.S.C.A. § 1345, above quoted, and will not be set forth herein; nor will Sections 722.666 or 722.667, which are substantially the same as subsections (a) and (d) of 7 U.S.C.A. § 1346, supra.

The opening sentence of Section 722.669(b) provides that the farm marketing excess for a farm shall be regarded as available for marketing "and the penalty thereon shall become due at the time any cotton produced on the farm is harvested." It is further provided that the penalty due with respect to any farm shall be remitted "on the date it becomes due or not later than March 15, 1956. * * *."

From the foregoing provisions of the statute and regulations we are of the opinion that the plaintiff is correct in its contention that when the defendant failed to dispose of the cotton acreage on his farm upon being advised of his obligation to do so, he became liable for the penalty, regardless of whether or not he harvested or marketed any of the cotton produced on that acreage.[5]

It will be noted that the penalty prescribed by the statute is not based upon the amount of cotton harvested or sold from the excess acreage, but upon the "farm marketing excess," which, ordinarily, is the "normal yield" of the excess acreage. Had Congress intended to make liability for penalty under the Act depend upon the harvesting or marketing of cotton from the excess acreage, it could easily have said so; and had it so intended, it would hardly have provided that the farm marketing excess should be considered as "available for marketing," and the Secretary of Agriculture, whose interpretation of the statute is entitled to weight, would hardly have required by Regulation[6] that the acreage of cotton on the farm be "adjusted to the farm acreage allotment," and that if such be not done within the prescribed time, "the farm marketing excess will be determined on the basis of the excess acreage and the normal yield for the farm." He could far more easily have said simply that the producer should not "harvest or market any cotton produced on the excess acreage."

Strength is added to this view when it is considered that when a cotton farmer, prior to completion of his harvest, seeks a determination that his "actual yield," as contrasted to his "normal yield," is such as to entitle him to a downward adjustment of his farm marketing excess under the circumstances outlined in 7

---

5. The defendant does not appear to strenuously contend that he is not liable here simply because he did not sell any of the cotton. His main argument is that he did not "harvest" any of it. In the case of United States v. Stangland, D.C.Ind., 137 F.Supp. 539, it was held under a statutory provision, 7 U.S.C.A. § 1340, dealing with wheat, which is substantially identical to 7 U.S.C.A. § 1346, with which we are concerned, that it was immaterial whether the producer actually sold his wheat or not, as far as penalty was concerned; there, however, there was no question that the "farm marketing excess" had been "harvested," so the case cannot be considered as squarely in point.

6. Regulations, Section 722.646(c).

U.S.C.A. § 1345, the regulations [7] provide that unharvested cotton shall be taken into account.

As pointed out by the plaintiff in its reply brief, to hold that liability for the penalty depends upon the harvesting or marketing of cotton grown on excess acreage might seriously interfere with the enforcement of the restrictive provisions of the Act. Such a holding would mean that a producer with excess acreage could avoid penalty by simply leaving his cotton on such acreage standing in the field, with all of the attendant possibilities of surreptitious picking and marketing which would frustrate one of the prime purposes of the statute, namely the prevention of excessive supplies of cotton moving in interstate and foreign commerce and the effect of such movement in depressing and causing violent fluctuations in the price of that commodity.[8]

■ If it be assumed, however, for purposes of argument, that the defendant would not be liable if he never harvested any cotton from the excess acreage, the question then arises as to whether or not the admitted actions of the defendant in picking three or four hundred pounds of cotton and then pouring it out on the ground for his cattle to eat constituted a "harvesting" of a part of the crop within the meaning of the regulations. If it did, then we agree with the plaintiff that the defendant would be liable for the entire penalty.[9]

The defendant argues that his action in picking a portion of the crop did not constitute a "harvesting" thereof because he did not put it in a house or barn, did not have it ginned, and did not sell it in the seed or otherwise. In support of this argument he cites from the Winston University Dictionary the following definitions of the word "harvest": "to gather in or reap as corn"; "that which is reaped and gathered in"; and "the gathering and bringing home the harvest."

■ We are not here concerned, however, with general or classical definitions of "harvest,"[10] which, obviously, have been evolved with reference to crops other than cotton, but, rather, with its meaning as used in administrative regulations relating to marketing quotas on cotton, designed to restrict the production of that specific crop. From a consideration of those regulations we are of the opinion that "harvest", as used therein, simply means the "picking" of the cotton. In that connection the regulations specifically define "seed cotton" as being "*the harvested fruit* of the cotton plant prior to ginning."[11]

■ The cotton picked by the defendant was certainly "seed cotton," regardless of whether he poured it out on the ground, carried it to a house or barn, or loaded it on a wagon or trailer. Since, as stated, the defendant admittedly picked a portion of his crop, he must be held to have harvested it.[12]

Let an order in accordance with the foregoing be entered.

7. Regulations, Section 722.652(a).

8. See 7 U.S.C.A. § 1341, which section constitutes the legislative findings with regard to marketing quotas on cotton.

9. As pointed out, Section 722.646(c) of the Regulations provides that there may be no disposition of excess acreage after any cotton is harvested therefrom, and Section 722.669(b) provides that the penalty first becomes due when *any* cotton is harveted from such excess acreage.

10. For other definitions see: Webster's New International Dictionary, 2d Ed.; 19 Words & Phrases, Harvest and Harvest-

ing; and 39 C.J.S., Harvest, p. 779. Some of those definitions refer simply to "reaping" or "gathering" without reference to "gathering in" or "bringing home." As a matter of fact, in Webster, op. cit., we find the phrase "harvest home," which is defined as the act of bringing home "the harvest."

11. Regulations, Section 722.642(gg), emphasis added.

12. We do not overlook the fact that the defendant says in his affidavit that he did not "harvest" any cotton, but that is simply a conclusion on his part; in his

earlier written statement, he says that he did "harvest" the quantity of cotton that has been mentioned. While we attach no controlling importance to it, as far as ruling on the plaintiff's motion is concerned, it would seem obvious as a matter of common sense that the defendant did not go to the trouble of picking three or four hundred pounds of cotton for the original purpose of pouring it out on the ground for cattle to eat; it goes without saying that he originally had some other purpose in doing his picking and then changed his mind; it will be re-

membered in that connection that he said in his December statement that he decided that he could make more money by picking for his neighbor than he could by picking his own crop and paying the penalty. Since this case is before us on the Government's motion for summary judgment, however, and since in passing on that motion we view the case in the light most favorable to the defendant, we state no opinion as to why the cotton was originally picked or as to when the defendant decided simply to pour the cotton out.