**UNITED STATES of America, Appellant,**

v.

**Warren M. JEFFCOAT, Appellee.**

**No. 7955.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1959.

Decided Nov. 20, 1959.

George E. Lewis, Asst. U. S. Atty., Columbia, S. C. (N. Welch Morrisette, Jr., U. S. Atty., Columbia, S. C., on brief), for appellant.

J. Reese Daniel, Columbia, S. C., for appellee.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

This is an action by the United States for the recovery of penalties claimed to be due on account of the defendant's violations of restrictions imposed upon him with respect to the 1956 upland cotton crop year under the Agricultural Adjustment Act of 1938,[1] as amended. After the denial of the plaintiff's motion for summary judgment and an abortive trial, following which a jury was unable to reach an agreement, the case was retried in the District Court without a jury. The District Court found as a fact that the defendant had destroyed his entire cotton crop, after harvesting only one small bale, and concluded that he was not liable for any penalties, except with respect to the one bale he had harvested.

1. 7 U.S.C.A. § 1281 et seq.

The United States questions the jurisdiction of the Court to inquire into the facts, since the defendant chose not to avail himself of the administrative remedies provided for the resolution of the factual questions.

On December 6, 1955, the defendant was notified that his upland cotton acreage allotment for the crop year 1956 was 17.1 acres. On May 29, 1956, the defendant reported that he had planted two fields of cotton, one of which he estimated to contain 17.1 acres, and the other approximately 38 acres. By actual measurement, after certain deductions, these two fields were found to contain 18.53 acres and 34.47 acres, respectively.

On June 18, 1956, the Agricultural Stabilization and Conservation Committee for his county notified the defendant of its determination that his farm was overplanted in cotton by 35.9 acres. By this notice he was advised that he could dispose of the excess acreage within twenty days, subject to an additional extension if requested, and that, if he did not do so, a penalty would be imposed upon the basis of the normal yield of the excess acreage. It further advised him that no marketing ticket could be issued for any upland cotton produced on the farm until the penalty was paid. He was informed that he must notify the County Committee if he wished to dispose of the excess acreage. By a notice dated August 9, 1956, the defendant was again advised that, if his farm remained overplanted, he would be ineligible for a crop support loan, and that none of his cotton could be sold until the penalty had been paid. This notice further informed him that he could not receive credit for excess acreage disposed of after cotton harvesting had begun.

By a letter dated August 17, 1956, the defendant was requested to furnish information as to his average cotton yield for the past five years. It does not appear that he supplied the requested information. Thereafter, however, on August 23, 1956, a committeeman filed a report containing his estimates of the annual cotton yield per acre on the defendant's farm for the preceding five years, in which he reported that the defendant did not meet with the Committee to assist in providing information, and that the estimate had been based upon normal yields. This report also contains the estimate, based upon an actual inspection of the defendant's cotton, that the prospective yield of those fields for 1956 was 375 pounds per acre, as compared with the average of the estimates for the preceding five years of 310 pounds per acre.

On August 28, 1956, a notice was sent to the defendant, which informed him of the Committee's determination that his excess cotton acreage was 35.9, that the normal yield per acre was 310 pounds, and that, based upon these normal yield figures, a penalty of $1,969.83 had been determined. This notice also informed the defendant that the excess poundage should not be larger than the amount by which the actual production of the entire farm exceeds the normal production of the allotted acres. He was told that if actual production was less than the normal yield determination, he could obtain a downward adjustment of the Committee's determination, provided he made application to the Committee within sixty days after completion of the harvest.[2]

By a letter dated October 17, 1956, the defendant was asked to report the cotton produced on his farm, the cotton marketed, penalties paid, and other data upon Form MQ–98–Cotton. This letter also again informed the defendant that he could obtain a downward adjustment of the determined excess to actual production figures, provided he made application to the Committee within the specified period.

The defendant ignored all of these requests and notices and took no steps to have the excess poundage determined upon the basis of actual production figures.

2. The period within which such an application might have been filed was subject to possible extension, but would terminate, in any event, on March 15, 1957.

On March 16, 1957, he was informed that the penalty of $1,969.83, previously determined upon the basis of the normal yield estimates, was due and payable.

Based upon the pleadings and certain admissions, the United States moved for summary judgment in its favor. This motion was denied by an order dated August 7, 1958, in which the opinion was expressed that the penalty determined upon the basis of normal yield figures, should be accorded finality if the defendant failed to avail himself of the administrative remedies to correct the estimates to actual production figures. The Court was of the opinion, however, that the record, as then constituted, indicated that the defendant had disposed of his entire cotton acreage before harvest, and that the penalty, if any, should be based upon actual production figures rather than preharvest estimates.

Thereafter, the case came on for trial before another judge and a jury.

From the transcript of the testimony there taken, it appears that the defendant testified that in late September or early October he had harvested 290 pounds of lint from one acre only and, thereafter, plowed under all of his remaining cotton, that he still had in his possession the one small bale he produced, and that he had disposed of none of his 1956 cotton crop.

An agent of the County Committee testified that he inspected the defendant's larger field in early October 1956, at which time he observed that at least one-third of that field had been picked. Based upon actual measurement of the field, this would indicate that approximately twelve acres had been picked. He also expressed his estimate of the number of acres which had been picked as 8–10, and, later, as up to 12. Sometime thereafter he returned to make a burr count in the two fields, and found that both had been entirely plowed under, so it was impos-sible to make the burr count. This witness testified that in 1956 he did not orally inform the defendant how he should proceed to dispose of excess cotton acreage, but testified that the defendant knew how to do it properly, for he had done so in previous years.

There was introduced in evidence defendant's application to the Production Credit Association for a farm loan. This application was dated January 26, 1957, and discloses the defendant's representation that, among other crops, he had produced 20 bales of cotton on 20 acres upon which he received a cash return of $4,-000 during the "last season." When confronted with this application, the defendant testified that he had produced no cotton in 1956, and that he had assumed that the "last season['s]" heading on the application form referred to the last season of actual production of cotton, or 1955.[3] The United States also offered a loan application addressed to the Production Credit Association, dated January 13, 1958, in which the defendant represented that his "last season['s]" production of cotton had been 14 bales from 22 acres returning $1,750 in cash, despite the fact that in 1957 he had no cotton quota because of his difficulties with the 1956 cotton crop year. This application is marked as having been received in evidence, but the transcript indicates that, after some discussion, it was excluded by the Court.

The transcript discloses that the Court's attention was not directed to the fact that the defendant had not supplied the County Committee with the information appropriate to "Form MQ–98–Cotton," or that in the previous order denying the motion for summary judgment, the Court had denied the request of the United States that the defendant be required to produce and furnish such information.

3. Clearly, the loan application called for a report of his gross receipts on his 1956 crops. Inclusion of receipts from the sale of 1955 cotton would have been a gross misrepresentation. He reported cash receipts from grains and other 1956 crops, but the $4,000 reportedly received from cotton "last season" approached half of the total of his reported receipts for "last season."

270

After receiving the charge of the Court, during which the Court commented that there was no evidence that the defendant had harvested or marketed more than his allotment in 1956, the jury was unable to agree upon a verdict. It was discharged and a mistrial was declared. Thereafter the Court, sitting without a jury, heard the case, found as a fact that the defendant had harvested only the one small bale and entered judgment for the United States for $80, based upon the value of that bale.

It would, indeed, be a harsh result if a farmer, ignorantly and innocently, supposed that his overplanting required him to plow under his entire cotton crop, did plow under his entire cotton crop, and was, thereafter, subjected to a penalty as if he had harvested it. The defendant here, however, was repeatedly advised of his right to have the Committee's determination of his excess poundage, based as it was upon an average of estimated annual yields adjusted to his actual 1956 production. If he did decide to dispose of his entire 1956 crop after harvesting only one bale, he had only to inform the Committee, which would have had an opportunity to determine for itself the actual fact at the time. Had the defendant thus proceeded, this controversy never would have arisen. He chose instead to be uncooperative and to withhold information when disclosure was required. He did so under circumstances which leave room for doubt as to the truthfulness of his story. His claim is contradicted by the testimony of the agent of the Committee, who said he saw the larger field at a time when 8–12 acres had been picked and none of it had been plowed under. His destruction of the evidence prevented verification of his story that the bolls were full of lint at the time of plowing.

Those who enjoy the benefits and advantages of the Act must comply with its restrictions and limitations, but the defendant chose to ignore its requirements after being fully informed of the consequences.

Doubtless it was to avoid this kind of controversy that the administrative scheme was devised.

The Act provides that the farm marketing excess shall be the normal production of that acreage planted to cotton on the farm which is in excess of the acreage allotment of that farm, but provides that the normal production figures may be adjusted to actual figures if the producer establishes actual production to the satisfaction of the Secretary.[4]

It also provides that the penalty shall be computed upon the basis of normal production of the excess acreage, except that if there is a downward adjustment of the farm marketing excess in accordance with the provision of § 1345, the difference between the amount of the recomputed penalty and that previously computed upon normal production figures shall be repaid or allowed to the farmer.[5]

4. 7 U.S.C.A. § 1345. "Farm marketing quotas; farm marketing excess
"The farm marketing quota for any crop of cotton shall be the actual production of the acreage planted to cotton on the farm less the farm marketing excess. The farm marketing excess shall be the normal production of that acreage planted to cotton on the farm which is in excess of the farm acreage allotment: *Provided*, That such farm marketing excess shall not be larger than the amount by which the actual production of cotton on the farm exceeds the normal production of the farm acreage allotment, if the producer establishes such actual production to the satisfaction of the Secretary."

5. 7 U.S.C.A. § 1346. "Penalties
"(a) * * *

"(b) The farm marketing excess of cotton shall be regarded as available for marketing and the amount of penalty shall be computed upon the normal production of the acreage on the farm planted to cotton in excess of the farm acreage allotment. If a downward adjustment in the amount of the farm marketing excess is made pursuant to the proviso in section 1345 of this title, the difference between the amount of the penalty computed upon the farm marketing excess before such adjustment and as computed upon the adjusted farm marketing excess shall be returned to or allowed the producer.
"(c) * * *
"(d) * * *."

The administration of the Act is vested primarily in local county committees. The regulations implementing the Act provide that anyone wishing a downward adjustment of his farm marketing excess, so that it should be recomputed in accordance with actual production figures, may apply to his county committee for such an adjustment. Generally, such application must be filed within sixty days after completion of the harvest and, in any event, by March 15 of the succeeding year.[6] Decisions upon such applications by the committee are subject to review by a review committee,[7] and an aggrieved producer, who is dissatisfied with the decision of the review committee, may have the decision reviewed in the courts.[8]

The adequacy of the administrative remedy, with its provision for judicial review, is not questioned. The remedy is appropriate to an effective administration of the Act and an efficient policing of the Act's restrictions. Had the defendant employed it, inspections of the fields before plowing would have avoided the factual dispute, for the state of the harvest could have been ascertained with certainty.

The defendant offers no excuse for his failure to avail himself of the administrative remedy. He stands only upon his claim that he destroyed the entire crop after harvesting one small bale. Perhaps he harvested no more than he says and the District Judge found. The agent's inspection of the larger field, however, indicates he did harvest much more and, when the defendant turned under the stalks without notice to the Committee, the suspicion arises that the bolls may have been empty of lint at the time of plowing. The suspicion is strengthened by his failure to supply informa-tion on Form MQ–98–Cotton, when it was requested of him.

We refer to these considerations only because they illustrate the reason and the practical necessity for the rule that the administrative remedy is exclusive. It provides a means of determination of the facts without controversy and without resort to subjective judgments of credibility and veracity.

The determination of the penalty on the basis of normal production estimates was binding upon the defendant until modified upon an application or in a proceeding contemplated by the Act and the regulations. The defendant was informed of the County Committee's readiness to recompute the penalty upon the basis of his actual production. He had but to apply in the prescribed manner to get a determination of the question he tendered for the first time in the District Court. For an unapparent reason, he chose not to do so. Nor did he otherwise seek to have the penalty determination of August 28, 1956 reviewed or modified. It, therefore, became final and binding upon him long before the commencement of this action and immune from collateral attack. Miller v. United States, 6 Cir., 242 F.2d 392; United States v. Stangland, 7 Cir., 242 F.2d 843; United States v. Bonderer, D.C.W.D.Mo., 139 F.Supp. 391; United States v. Johnson, D.C.W.D.Ark., 155 F.Supp. 898; United States v. Watkins, D.C.E.D.Ark., 147 F.Supp. 786.

In this collateral attack upon the determination of the Committee, we think the District Court should not have considered the merits of the tendered defense.

Reversed and remanded.

6. 21 F.R. 5167, § 722.752.
7. 21 F.R. 5268, § 722.756(a).
8. 7 U.S.C.A. §§ 1365, 1366; 21 F.R. 5168, § 722.756(b).