I respectfully dissent.
 Background
On February 23, 1998, Bridgette Douglas and Liberty National Life Insurance Company ("Liberty National") entered into an employment contract.[2] At the same time, they entered into a "Mutual Agreement to Arbitrate" (hereinafter, "the Agreement").
On June 24, 1998, Douglas was involved in an automobile accident in which she sustained neck and spinal injuries. According to Douglas, she sustained those injuries while she was within the line and scope of her employment. Douglas claimed workers' compensation benefits and took sick leave in accordance with Liberty National's sick-leave policy.
Liberty National contends that long after Douglas's sick leave had expired — after nearly a year and a half and despite repeated requests — she failed either to return to work or to contact her manager to discuss returning to work. On October 18, 1999, Liberty National deemed Douglas to have voluntarily resigned her position and, therefore, terminated her employment.
On March 6, 2000, Douglas sued Liberty National, alleging both that she was entitled to benefits under the Alabama Workers' Compensation Act (Count I), and that her termination was wrongful (Count II). The trial court severed the claims. It transferred Douglas's claim for workers' compensation benefits to the non-jury trial docket and retained her wrongful-termination claim on the jury trial docket.
On August 11, 2000, Liberty National, relying on the arbitration agreement, moved to stay the proceeding on Douglas's wrongful-termination claim and to have that matter referred to arbitration. In support of its motion, Liberty National submitted a copy of the Agreement and the affidavit of Thomas Hamby,[3] which stated, in pertinent part:
 "4. Liberty National is a corporation, incorporated in Alabama with its principal place of business in Birmingham, Alabama. Liberty National is approved to sell insurance in nearly every *Page 812 
state and does business throughout the Southeastern United States. Liberty National has acquired many insurance companies located outside of Alabama and currently services the policyholders who held policies at the time of the acquisitions. Liberty National has policyholders in most states with whom Liberty National directly corresponds. In the course of doing business, Liberty National frequently sends and receives correspondence via the U.S. mail and Federal Express across state lines.
 "5. When hiring insurance agents, such as Douglas, Liberty National fully anticipates that the agents will service the business of existing clients who move to other states and/or service clients who purchase insurance in the state where the agent is licensed but who reside or work in another."
(C.R. at 28.)
Douglas responded to Liberty National's motion to stay the trial court proceeding and to have the matter referred to arbitration. She claimed that under the terms of the Agreement because Liberty National filed its motion more than 60 days after she filed her complaint, her wrongful-termination claim is not subject to arbitration.[4] (C.R. at 33.) She also argued that part of the consideration for the Agreement was her continued employment with Liberty National and that because Liberty National discharged her the Agreement is void for want of consideration. (C.R. at 33.)
The trial court heard oral argument on Liberty National's motion, but on its own motion raised the question whether Douglas's at-will employment as an insurance agent with Liberty National sufficiently involved interstate commerce so as to invoke the Federal Arbitration Act ("the FAA"). (C.R. at 41.) The trial court gave Liberty National 10 days to submit additional authority on that issue. Liberty National's reply was substantially similar to Hamby's affidavit:
 "1. As previously stated, Liberty National is a corporation licensed to sell insurance in nearly every state. Throughout the years, Liberty National has acquired many companies located in foreign states. Liberty National services policyholders who held insurance policies with the foreign companies at the time of the acquisitions. In addition, Liberty National and its agents service clients who purchase insurance in Alabama but who work in other states or who have moved to other states. Douglas was hired by Liberty National as an insurance agent on or about February 23, 1998, and Liberty National fully anticipated that she, like Liberty National's other agents, would service clients located in foreign states. Douglas's job required her to drive her automobile extensively in order to call on clients. Throughout the course of her workday, Douglas purchased gasoline and other resources brought into Alabama from other states to enable her to perform her job duties. Douglas sold insurance policies to clients who paid premiums to Liberty National, which, in turn, invested the premiums collected in foreign enterprises. Liberty National also orders equipment and supplies from companies located in foreign states to be shipped across state lines into Alabama and frequently sends correspondence all over the country via the U.S. Mail and Federal Express." *Page 813 
(C.R. at 42.) The trial court denied Liberty National's motion, stating as follows:
 "After considering said motion and the arguments and briefs of the parties, the Court finds that the Defendant has failed to meet its burden of showing that either Plaintiff's claim of wrongful termination or its original contract of hire with Plaintiff had or has a substantial effect on interstate commerce."
(C.R. at 54.) Liberty National moved to alter, amend, or vacate the trial court's order on the ground that the trial court erroneously held that the underlying employment contract with Douglas did not affect interstate commerce sufficiently to invoke the FAA, but the trial court denied the motion. Liberty National appeals.[5]
 Standard of Review
This Court reviews de novo a trial court's denial of a motion to stay its proceedings pending arbitration.[6] Tefco Fin. Co. v. Green,793 So.2d 755 (Ala. 2001); Green Tree Fin. Corp. v. Vintson, 753 So.2d 497,502 (Ala. 1999).
This Court has held that "`to prevail on an assertion of arbitrability, the moving party is required to produce some evidence which tends to establish its claim,'" Jim Burke Auto., Inc. v. Beavers,674 So.2d 1260, 1265 (Ala. 1995) (opinion on application for rehearing) (quoting In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan. 1994)), and "has the burden of proving the existence of a contract calling for arbitration and proving that that contract involves a transaction affecting interstate commerce," Tefco Fin. Co. v. Green, 793 So.2d at 758(quoting Ex parte Caver, 742 So.2d 168, 172 n. 4 (Ala. 1999)) (emphasis added).
 Commerce Clause Jurisprudence
In 1824, in Gibbons v. Ogden, 22 U.S.(9 Wheat.) 1 (1824), the Supreme Court of the United States addressed the scope of the Commerce Clause. The New York Legislature had granted Ogden a monopoly "right to navigate waters" between Elizabethtown, New Jersey, and New York, New York. Id. Gibbons had infringed that right by operating two ships on the Elizabethtown-New York route, and the New York court had enjoined Gibbons's operation. The Supreme Court of the United States reversed, finding that navigation was commerce and that Congress's power over commerce preempted New York's licensing scheme. Chief Justice Marshall, writing for the Court, stated:
 "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. . . .
". . . .
 "The subject to which the power is next applied, is to commerce `among the several States.' The word `among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior." *Page 814 
22 U.S. (9 Wheat.) at 189-94. Chief Justice Marshall continued:
 "It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. . . .
". . . .
 "The genius and character of the whole government seem to be, that its action is to be, applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. . . ."
22 U.S. (9 Wheat.) at 194-95. Nonetheless, it was not until 1887 that the passage of the Interstate Commerce Act, 15 U.S.C. § 1, "ushered in a new era of federal regulation under the commerce power." United Statesv. Lopez, 514 U.S. 549, 554 (1995). Then, in 1937, in response to the New Deal legislation, the Supreme Court of the United States upheld the National Labor Relations Act and the National Labor Relations Board's decision to end the practice of discharging employees for union activity. NLRB v. Jones Laughlin Steel Corp., 301 U.S. 1 (1937).[7]
The Supreme Court held that intrastate activities could "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." Id. at 37.
Four years later, the Supreme Court upheld the Fair Labor Standards Act, which regulated the hours and wages of employees engaged in local manufacturing and prohibited the shipment of goods produced by manufacturers who were paying their employees less than the prescribed minimum wage or were requiring more than the prescribed maximum number of hours of work. United States v. Darby, 312 U.S. 100 (1941). In Darby, the Court reaffirmed the notion that substantial intrastate activities could affect interstate commerce. Subsequently, the Supreme Court stated that "[a]ctivities that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly
were beyond Congress' reach." Lopez, 514 U.S. at 555, citing A.L.A.Schechter Poultry Corp. v. United States, 295 U.S. 495, 546 (1935) (emphasis added).
In 1942, in Wickard v. Filburn, 317 U.S. 111 (1942), the Supreme Court of the United States held that, under the Commerce Clause, Congress had the power to limit the production of wheat by a farmer who sowed 23 acres of wheat for consumption on his own farm.[8] The Supreme Court instructed, first, that in weighing the effect of an activity on
interstate commerce, courts are to consider the aggregate effect on interstate commerce of that type of activity. 317 U.S. at 124-28; see also Hodel v. Virginia Surface Mining *Page 815 Reclamation Ass'n, 452 U.S. 264, 277 (1981); Tefco, 793 So.2d at 759. Furthermore, the Wickard Court expressly rejected the earlier "direct/indirect-effects" analysis of interstate commerce; thus, the Court stated:
 "[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as `direct' or `indirect.'"[9]
317 U.S. at 125. The Wickard Court noted that although Filburn's contribution to the demand for wheat "may be trivial by itself," that fact is not "enough to remove him from the scope of federal regulation, where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." Id. at 127-28.
For over 50 years, following Wickard and up until Lopez, 514 U.S. 549, the Supreme Court had not overturned a congressional act on the basis that the act violated the Commerce Clause. Then, in Lopez, the Supreme Court found that the relationship between the Gun-Free School Zones Act and interstate commerce was too attenuated to find a substantial effect on commerce.[10] Lopez was convicted of possession of a firearm in a school zone in violation of the Gun-Free School Zones Act. Reviewing several Commerce Clause cases, the Court identified three categories of activity
 "that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."
514 U.S. at 558-59 (citations omitted).
The government had argued in Lopez that crime in and around schools has a substantial effect on interstate commerce because "the costs of violent crime are *Page 816 
substantial" and "violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." Id. at 563-64. The Supreme Court, however, refused to accept the government's argument because, it reasoned, the Gun-Free School Zones Act had "nothing to do with `commerce.'"[11] Id. at 561. Lopez did not overrule Wickard, but, instead, restricted the application of the Commerce Clause power to matters of commerce. There is no question that the arbitration of disputes involving insurance — such as in the case now before this Court — is a matter of commerce. United Statesv. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944).
 The Federal Arbitration Act
The Supreme Court of the United States held in Marine Transit Corp. v.Dreyfus, 284 U.S. 263 (1932), that the FAA was a constitutional exercise of Congress's power. The FAA provides:
 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2. "The [FAA] preempts contrary state law (specifically, contrary law based on Ala. Code 1975, § 8-1-41(3),[12] and public policy) and renders enforceable a written predispute arbitration agreement but only if that agreement appears in a contract evidencing a transaction that `involves' interstate commerce." Southern United Fire Ins. Co. v.Knight, 736 So.2d 582, 585-86 (Ala. 1999); see Tefco Fin. Co. v. Green,supra.
The Supreme Court of the United States has interpreted the term "involving commerce" broadly as the "functional equivalent" of the phrase "affecting commerce." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265,274 (1995). When Congress uses the phrase "affecting commerce," this normally signals "Congress' intent to exercise its Commerce Clause powers to the full." Id. at 273.
In Sisters of the Visitation v. Cochran, 775 So.2d 759, 763 (2000), the Sisters of the Visitation contracted with an in-state contractor to renovate a chapel located in Alabama and owned by the Sisters. Pursuant to an arbitration provision in the contract, the Sisters sought arbitration of their dispute with the contractor. In my dissent in that case, I noted that the majority held that the FAA can apply to a contract only if that "individual transaction `substantially affect[s]' interstate commerce."[13] Since our decision in Sisters in *Page 817 
March 2000, this Court has routinely denied a party the right to arbitration where that party failed to prove that the individual transaction substantially affected interstate commerce. SeeAlternative Fin. Solutions, LLC v. Colburn, 821 So.2d 981 (Ala. 2001) (denying arbitration where borrowers brought an action against lenders challenging the legality of certain loans); Ex parte Kampis,826 So.2d 819 (Ala. 2002) (denying arbitration in an action brought by a home purchaser against a contractor); Ex parte Learakos,826 So.2d 782 (Ala. 2001) (denying arbitration in an action brought by a home purchaser against a real estate company and its agents).
The Supreme Court of the United States stated in Lopez that in order for a federal statute that regulates commercial transactions to be a valid exercise of Congress's Commerce Clause power, the aggregate nationwide participation in that activity — not the individual transaction in isolation — must "substantially affect" interstate commerce. Lopez, 514 U.S. at 556-57. This "substantial-effect" test — used to determine the constitutionality of a statute under the Commerce Clause — was not a new standard created in Lopez, but has been the test of a statute's constitutionality since the early twentieth century.Id. at 555-57.
Once it has been determined that Congress acted within its Commerce Clause power in enacting a statute, whether that statute reaches certain activities does not depend on whether that individual act, when considered separately from all similar acts, has a substantial effect on commerce. As Wickard made clear, Filburn's "trivial" wheat production could be reached by the Agricultural Adjustment Act. The standard established by the Supreme Court of the United States is that "`where ageneral regulatory statute bears a substantial relation to commerce, thede minimis character of individual instances arising under that statute is of no consequence.'" Lopez, 514 U.S. at 558 (quoting Maryland v.Wirtz, 392 U.S. 183, 197 n. 27 (1968)).
The standard for the application of the FAA to an individual contract was made clear to us in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265,267 (1995). The FAA provides, in pertinent part that "a contract evidencing a transaction involving commerce . . . shall be valid. . . ."9 U.S.C. § 2 (emphasis added). The Supreme Court of the United States held in Allied-Bruce Terminix that the requirement in the FAA that an individual contract involve interstate commerce should be read in the broadest possible terms because the word "involving" signals an intent to "exercise Congress' commerce power to the full." 513 U.S. at 277. The Court also stated that to be subject to the FAA a contract did not have to evidence a transaction that was "substantially interstate." Id. at 269.
Thus, I believe this Court erred when it held in Sisters that a particular contract, in order to be enforceable under the FAA must, by itself, have a substantial effect on interstate commerce, and this Court errs *Page 818 
again today by applying the Sisters standard to this case.
In this case, although Douglas did not directly sell or service insurance policies outside the State of Alabama, according to the evidence, the policies that she sold generated revenue for Liberty National that did not inure solely to the benefit of Liberty National in Alabama, but moved across state lines. Such sales of policies have, in the aggregate, a substantial effect on interstate commerce.
In United States v. South-Eastern Underwriters Ass'n, supra, the Supreme Court of the United States held that an insurance company doing business across state lines engages in interstate commerce:
 "Interrelationship, interdependence, and integration of activities in all the states in which they operate are practical aspects of the insurance companies' methods of doing business. . . . Premiums collected from policyholders in every part of the United States flow into these companies for investment. As policies become payable, checks and drafts flow back to the many states where the policyholders reside. The result is a continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts."
322 U.S. at 541.
Although this Court has rejected the notion of a per se rule for determining whether a transaction is one "involving [interstate] commerce," we have nevertheless recognized that intrastate insurance transactions may affect interstate commerce:
 "[I]nsurance transactions that stretch across state lines or intrastate insurance transactions that otherwise have the requisite (substantial) effect on interstate commerce constitute `Commerce among the several States,' so as to make them subject to regulation by Congress under the Commerce Clause of the United States Constitution."
Southern United Fire Ins. Co. v. Knight, 736 So.2d at 586.
 "`The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby, and charged with great responsibility.'"
United States v. South-Eastern Underwriters Ass'n, 322 U.S. at 547 n. 26 (quoting German Alliance Ins. Co. v. Superintendent of Insurance of Stateof Kansas, 233 U.S. 389 (1914)).
Although it is undisputed that Douglas is an Alabama resident, that Liberty National is an Alabama corporation, and that the employment transaction in this case occurred entirely within Alabama, Liberty National has presented the requisite "`some evidence which tends to establish its claim,'" Jim Burke Auto., Inc. v. Beavers, 674 So.2d at 1265 (opinion on rehearing) (quoting In re American Freight Sys., Inc.,164 B.R. 341, 345 (D.Kan. 1994)). Liberty National alleged that "Douglas sold insurance policies to clients who paid premiums to Liberty National, which, in turn, invested the premiums collected in foreign enterprises"; these transactions were "part of a pattern of economic activities that in the aggregate affected interstate commerce." Tefco, 793 So.2d at 760. Therefore, Douglas's agreement to arbitrate is properly reached by the FAA, and *Page 819 
Douglas's claim should have been submitted to arbitration.
For the foregoing reasons, I dissent.
[2] Douglas was hired as an insurance agent. Her duties included selling life-insurance policies to new clients and servicing Liberty National's existing clients in south Alabama.
[3] Hamby is a vice president of Liberty National.
[4] The Agreement states that if either party to the "Agreement seeks relief in any court of competent jurisdiction for any claim or cause of action covered by this Agreement the defendant to such action may, at any time within sixty (60) days of the service of the Complaint, require all or part of the dispute to be arbitrated. . . ." (C.R. at 29.)
[5] This Court has stated:
 "A direct appeal is the proper procedure by which to seek review of a trial court's order denying a motion to compel arbitration. See Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala. 2000). This Court reviews de novo a trial court's denial of a motion to compel arbitration. Id. at 742-43."
Tefco Fin. Co. v. Green, 793 So.2d 755, 758 (Ala. 2001).
[6] Effective October 1, 2001, Rule 4(d), Ala.R.App.P., provides: "An order granting or denying a motion to compel arbitration is appealable as a matter of right, and any appeal from such an order must be taken within 42 days (6 weeks) of the date of the entry of the order, or within the time allowed by an extension pursuant to Rule 77(d), Ala.R.Civ.P."
[7] In NLRB v. Jones Laughlin Steel Corp., the Act was challenged in its entirety as an attempt to regulate not only commerce but all industry, but the Court addressed only the actions that burdened or obstructed commerce.
[8] Filburn had challenged the constitutionality of the Agricultural Adjustment Act, which established a wheat acreage allotment of 11.1 acres and a normal yield of 20.1 bushels of wheat per acre. Wickard, 317 U.S. at 114.
[9] In Sisters of the Visitation v. Cochran, 775 So.2d 759, 764
(2000), the case on which the majority relies for its decision, a majority of this Court, interpreting Wickard, stated:
 "[W]e conclude that the question whether the actions of an individual, which actions standing alone would be considered `local' actions or actions with only an `indirect' influence on interstate commerce, may be considered to have a substantial influence on interstate commerce is to be determined by considering how critical the regulation of all similarly situated persons' activity is to the accomplishment of the primary purpose of a statute drawn to regulate an activity clearly having a substantial effect on interstate commerce."
Thus, in Sisters of the Visitation this Court modified the United States Supreme Court's Wickard decision to exclude local or indirect effects unless those effects are sufficiently "critical" to the primary purpose of the statute. This kind of direct-indirect analysis was expressly rejected by the United States Supreme Court in the language recited fromWickard and was rejected for good reason because of the infinite malleability of the concept of directness. Wickard, 317 U.S. at 125.
[10] Justice Kennedy, concurring specially, and joined by Justice O'Connor, said that the Gun-Free School Zones Act "upsets the federal balance to a degree that it renders it an unconstitutional assertion of the commerce power. . . ." Lopez, 514 U.S. at 579 (Kennedy, J., concurring specially).
[11] The Court noted that if the Gun-Free School Zones Act passed constitutional muster, "it is difficult to perceive of any limitation on federal power. . . ." 514 U.S. at 564.
[12] Alabama Code 1975, § 8-1-41(3), makes void any agreement to arbitrate future, as opposed to present, disputes.
[13] I dissented in Sisters of the Visitation, stating:
 "I agree with both Chief Justice Hooper and Justice Maddox that the majority opinion incorrectly extends United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The majority requires that an individual transaction `substantially affect' interstate commerce before it can be subject to the Federal Arbitration Act (the `FAA'). The majority also establishes a higher standard of `substantial effect' than is permitted under existing United States Supreme Court precedent. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The United States Supreme Court has held that in the FAA Congress exercised the full scope of its Commerce Clause power. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753
(1995). Until the United States Supreme Court overrules Wickard, Congress may constitutionally subject to federal jurisdiction economic activity that affects interstate commerce, as long as that effect is substantial when considered in the aggregate. I, therefore, respectfully dissent."
Id. at 782.