OPINION OF THE COURT
Lewis Bart Stone, J.
A Dunaway I Mapp/Wade hearing was held before me on January 29, 2002. Officer Neal Ariano testified and I find him credible. The defendant offered no evidence.
Statement of Facts
On or about May 17, 2001, Officer Ariano, an 11 year veteran of the New York City Police Department assigned to the Grand Larceny Unit of the 19th Precinct, was assigned to investigate a series of pickpockets and larcenies on the New York City bus system. This investigation was based on information provided by eyewitnesses who had seen two male blacks pickpocketing on a Lexington Avenue bus on Manhattan’s upper east side. One witness, Lisa Hordes, provided a description of both individuals.
Based upon Hordes’ information, Ariano had the description of the perpetrators and the crime of larceny imput by a detective into a police department computer programmed to produce a photo array of possible suspects. The six-photograph array thus created contained the defendant’s photograph.[1]
The next day, on May 18, 2001, Ariano displayed this printout to Hordes who selected therefrom a picture of the defendant as the person she had seen on the bus on May 17 picking a passenger’s pocket; Hordes marked the printout with her initials next to the defendant’s photograph.[2]
Five days later on May 23, 2001, Ariano and his partner were assigned to patrol the area of 86th Street and Second Avenue in Manhattan. Ariano saw the defendant and separately charged Gary Graham board a Second Avenue bus. Ariano recognized the defendant as the individual whose photograph had been picked out by Hordes in the photo array and boarded the bus with his partner. He observed the defendant and *533 Graham standing several feet apart on the bus near the rear door and then saw the defendant bump into an elderly woman while placing his hand near her pocketbook. The defendant and Graham then exited the bus, followed by the two officers who stopped the defendant and Graham and arrested them. The defendant was searched and three metro cards were recovered.[3]
Later that day, the officers conducted a lineup at the 19th Precinct which consisted of four fillers (from a local shelter) and the defendant. The defendant elected to be number three in the lineup. Kordes and two other civilian witnesses came to the precinct and waited in a room separate from the lineup room.[4] They were instructed not to speak about the case and remained with another police officer during this time. All the members of the lineup held cards with numbers and Kordes, when asked to look at the lineup to see if she recognized anyone, chose the defendant and identified him as the person she saw on the Lexington Avenue bus on May 17. A photograph of the lineup was admitted into evidence.
Following the lineup, the defendant was charged with, and later indicted for jostling (Penal Law § 165.25) and other crimes. The People also introduced a printout of a computer generated photo array to show what Kordes had seen. Although the printout Kordes used on May 18 was lost, Ariano testified that the printout in evidence was obtained by providing, to the same detective who had imput the information into the computer on May 18, the defendant’s name as well as the date of original query to the computer. The detective told Ariano that the computer record of May 18, 2001 contained only the array showing the defendant’s photograph, and that the printout was identical to the May 18 printout.
At the hearing, the officer specifically identified the second printout by recognizing the defendant’s photograph and three other photographs in the array. That printout was admitted into evidence.
Conclusions of Law
The defense contends that the defendant was arrested without probable cause and that therefore his subsequent search was illegal. The defense also contends that the lineup *534 should be suppressed on three separate grounds: (1) that the lineup is the “fruit” of an illegal arrest, (2) the lineup was tainted because the witnesses were kept together “before, during and after each viewing” by an individual witness, and (3) the lost “original” photo array creates a presumption that the photo identification was impermissively suggestive.
Upon a motion to suppress, the People must present evidence establishing that the police conduct was reasonable and that the procedures used were not unduly suggestive. Once that burden is met, the defense must prove the procedure was unduly suggestive to prevail on its motion. (People v McRae, 195 AD2d 180, 185 [1st Dept 1994].)
The court finds that the police had probable cause to arrest the defendant. The police received information from a citizen informant. The photograph array shown to the informant was based on information and public records available to the police department; the witness identified the defendant as the person who she saw committing a pickpocket. Based on that alone, the police had probable cause to arrest the defendant which they did five days later. In fact, the defendant was seen on an east side bus and observed jostling[5] a woman on that bus, the very crime the witness had observed five days earlier. Based on this cumulative information, the police had probable cause to arrest the defendant and arrange a corporeal identification. The police’s restraint in not arresting the suspects immediately in order to observe their subsequent behavior is to be commended rather than penalized by somehow requiring such action to vitiate the validity of the basis of their arrest.
The court further finds the photo array shown to Kordes not unduly suggestive. Although the array printout introduced in evidence and reviewed by the court was not the same printout reviewed by Kordes, the court finds that the program which was used to generate the printout created a printout in the same form as shown to Kordes. In addition, Ariano testified that he recognized four of the six photographs. The array printout accepted into evidence and the testimony presented at the hearing was sufficient to show that the array was not only not suggestive, but was the same as the original printout, except for handwritten notations made by Kordes after her viewing. For this hearing, the court finds accepting this printout into evidence proper. There is no evidence of prompt *535 ing or suggestions by police to the witness to select the defendant’s photograph. (People v Garcia, 219 AD2d 541 [1st Dept 1995]; see generally People v Acosta, 176 AD2d 534 [1st Dept 1991].)
Defendant seeks sanctions by reason of the People’s failure to produce the “original” photo array from which Kordes picked out defendant’s likeness, citing the People’s Rosario obligations. Building on this theory, the defendant proposes that the proper sanction would be to impose a presumption that the photo array procedure was impermissively suggestive. If this logic holds, there would be no validity to defendant’s arrest, and as a result, the subsequent lineup would have to be suppressed as the fruit of the poisonous tree. This logic, however, fails. The fundamental flaw to this claim is that the “original” was never lost; the “original” photo array is the information stored in the computer memory. That recorded array, as long as it has remained unaltered (and there is no evidence of such alteration), remains the electronic record until such time it is retrieved by using appropriate commands to the computer. The People have shown that the electronic record was appropriately retrieved and reproduced to paper, resulting in the second printout. In addition to the inherent logic of admitting such printout, this admission of such printout is now mandated by the Electronic Signatures and Records Act (ESRA). (State Technology Law §§ 101-109.) ESRA deals, inter alia, with the use and legal admissibility in New York courts of records which, as here, are stored by electronic means. ESRA, in conjunction with Civil Practice Law and Rules § 4518 (the Business Records Rule), permits this court to consider the second printout as proof of the original computer record due to the manner in which the document was stored and retrieved.[6]
The Rosario rule (see People v Rosario, 9 NY2d 286 [1961] requires the People to make available to the defense writings in the People’s custody pertaining to the subject matter of testimony of a prosecution witness to enable a defendant to conduct his defense and have the benefit of any exculpatory recorded material therein. Where the People do not or cannot deliver to the defendant or his counsel those writings, the court *536 must impose a proper sanction, which may include the creation of the presumption that the trier of facts, in the absence of the material, could presume it was helpful to the defendant.
Since the advent of the computer and the growth of the electronic storage of information, there has been a growing appreciation of the need to rearticulate rules of law relating to what is a writing, and in such context, what is an original document. There now seems a consensus embodied in recent proposed and enacted legislation that for the precomputer concept of “writing” the term “record” should now be substituted to accommodate this new reality. In 1999, New York adopted ESRA as State Technology Law article I (L 1999, ch 4 § 2 [eff Mar. 26, 2000]). Under section 105 of the ESRA, the electronic facilitator is authorized to issue rules and regulations. Under 9 NYCRR part 540.5 (a), issued under this authority, an electronic record has the same force and effect as a record not produced or maintained by electronic means. Under subdivision (b) of this section, government entities of the state are authorized and empowered to make and keep electronic records. ESRA’s purpose is to “ensure that persons who voluntarily elect to use * * * electronic records can do so with confidence that they carry the same force and effect of nonelectronic * * * records.” (9 NYCRR 540.01 [b].)
Under this concept, the record is electronic information which is retrievable in usable form. As no reported New York decision has yet cited or construed ESRA or the State Technology Law, this is generally a case of first impression, and especially as to whether such law applies in the context of a criminal proceeding or trial. ESRA itself makes no distinction between civil and criminal proceedings, and was designed to be generally applicable and to change prior ways of doing business, superceding all other statutes, cases and rules. The only reason that a criminal or civil context might lead to a different result is, if in some way, an important constitutional protection of a criminal defendant would be lost by applying ESRA in a criminal proceeding. Thus, the issue here is whether the maintenance of a record in electronic form, and the use of a manifestation of the record, either as a printout or as a screen or other display, in connection with the arrest, prosecution and possible conviction of a criminal defendant, could violate constitutional rules.
Here, as both printouts were generated in the same format, there can be no prejudice from the fact that the defendant was selected from the first printout and that a second identical *537 printout was later used at hearing or trial. Each is identical and conveys the full recoverable information. To decide that to the contrary, that only a manifestation in human readable form could be an original record, is absurd. Where, for example, a witness is shown only the screen display, what must the People keep? For on such an analysis the printout of the screen could not be the “original.” The purpose of requiring the preservation of a record is clear. Concern for the integrity of information has always led the courts to prefer the original, and have led to many rules to bar or limit the use of non-“original” material. Here the original array was in electronic form in the computer memory; the testimony was unequivocal that the printouts used by Kordes and the witness at the hearing were generated in the same manner. Thus, there is no Rosario issue and, as a result, defendant’s argument crumbles.
A second question before the court at this hearing is whether the array was suggestive. As the array seen by the court was the same printout Kordes saw, and as the faces and their selection was selected by the computer, the preferred printout was properly received into evidence. I also find, after a viewing of such printout and hearing the testimony at the hearing, that such array was not suggestive.
Likewise, the People have met their burden to establish the lack of any undue suggestiveness with respect to the lineup. (People v Chipp, 75 NY2d 327, cert denied 498 US 833.) Kordes was appropriately isolated from the defendant and the fillers and there is no evidence that anyone spoke to her about the lineup before it was conducted. Furthermore, the composition of the lineup was satisfactory, as it constituted a fair grouping. (Chipp, supra.)
Although ESRA on its face resolves the issue of the propriety of accepting the second printout, there is an issue as to whether, as a result of subsequent federal legislation, ESRA has been preempted or voided.
Subsequent to the adoption of ESRA, the Federal Electronic Signatures in Global and National Commerce Act (E-Sign) (15 USC § 7001 et seq.) was adopted on June 30, 2000 (eff Oct. 1, 2000, generally, with some provisions not taking effect until Mar. 1, 2000). E-Sign purports to preempt certain state laws relating to electronic records and transactions. One exception to E-Sign was to allow state laws adopting the “Uniform Electronic Transactions Act [UETA] as approved and recommended for enactment in all of the States by the National Conference of Commissioners of Uniform State Laws in 1999” *538 not to be preempted. (15 USC § 7002 [a] [1].) A comparison of UETA with ESRA makes it clear that ESRA is not the same as, a clone of, or even similar to UETA. Assuming the validity of E-Sign and the propriety of the breadth of its applicability according to its terms, E-Sign thus purports to preempt ESRA in accordance with E-Sign’s terms. Accordingly, in New York it may be necessary to determine whether E-Sign or ESRA applies to electronic records in general, and to the electronic record at issue in this case.
It is no longer arguable that federal law, enacted pursuant to the exercise of constitutional powers, in a manner not viola-tive of the Federal Constitution, cannot preempt state law. E-Sign, thus, to the extent it was so enacted preempts ESRA. From the language of 15 USC § 7001 (a) by referring to “any transaction in or affecting interstate * * * commerce” it is clear that E-Sign purports to rest its authority upon the Interstate Commerce Clause of the United States Constitution. (United States Const, art I, § 8 [3].) The disjunction of “transaction [s] in or affecting interstate commerce” (emphasis added) constitutes an attempt to give as broad a scope as possible to E-Sign.[7] However, the Supreme Court has recently been quite sensitive to attempted end-runs by Congress around the Tenth Amendment where the Interstate Commerce Clause is invoked beyond its natural scope. (See e.g. People v Lopez, 514 US 549 [1995] [finding that Congress could not regulate guns near a school on an interstate commerce theory], and United States v Morrison, 529 US 598 [2000] [voiding the Violence Against Women Act, purportedly adopted under authority of the Commerce Clause].)
Here, E-Sign expressly preempts state law with respect to records kept by a state or local agency, except for certain express exceptions, and provides that, after evaluation, the Secretary of Commerce may delete certain of these exceptions. (15 USC § 7003.) While the thrust of E-Sign, that it relates to “transactions in or affecting interstate commerce,” when applied to the instant case, would seem to exclude the police records used in this case, as there is no transaction as defined by *539 15 USC § 7006 (13), the effect of preemption is much broader. E-Sign would, for example, purport to cover the same police record if it were used (or perhaps referred to) in a commercial transaction. The impact of imposing upon a state a rule as to such state’s records when used in a transaction, but not when the same records are not, is in the real world a rule imposing the rule on such state’s records for all purposes. To postulate that the state’s power remained unaffected, because state law under a different state approach to electronic records and signatures (such as ESRA) would remain valid for transactions or transactions not affecting interstate commerce, would be close to impossible or at least highly impracticable to carry out. Such a result implies that the state need use two sets of rules relating to the same records or should as an alternative have two sets of records in order to preserve its own law as to records. This effective imposition of a federal rule on state records thus may well constitute a violation against the rule against commandeering the activities of a state to achieve a federal purpose. (See Printz v United States, 521 US 898 [1997] [holding that the Brady Hand Gun Act provisions requiring the states to conduct background checks on gun purchases was unconstitutional].)
A second reason why E-Sign may not apply in New York, at least in respect to transactions not in interstate commerce, is the Tenth Amendment to the United States Constitution. The issue here is whether and to what extent the Federal Government may use the language of the Interstate Commerce Clause to go beyond issues of interstate commerce to impose a better nationwide rule. While admittedly, life would be simpler and perhaps better if the same rule applied to all contracts, their formation and interpretation across the country,[8] creating uniformity for commercial laws has been generally left to state action. Coordination and confluence of rules in the area where *540 appropriate, have come from the Uniform Laws movement and the recommendations of legal scholars, bar associations, and interested public and private parties. “Simpler and better” also does not trump constitutional requirements or principles of federalism.
The court must, when faced with constitutional problems, see whether such issues may be avoided in determining the case before it. The court should also not tread upon a legislative act either of Congress or of the State to find it void or preempted unless squarely forced with the need to do so in deciding the case at hand. Fortunately, the court need not enter such murky waters in this case. Although there are clear conflicts between E-Sign and ESRA for many purposes, the same result would obtain in this case whether E-Sign or ESRA. applies, and accordingly, the constitutional and preemption issues need not be reached in rendering this decision.
Under E-Sign, the “record” means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form. (15 USC § 7006 [9].) E-Sign further provides in determining what is an original document, that “[i]f a statute, regulation, or other rule of law requires a * * * record * * * to be * * * retained in its original form, or provides consequences if the * * * record is not provided, available, or retained in its original form, that statute, regulation, or rule of law is satisfied by an electronic record” meeting the requests of 15 USC § 7001 (d) (1). (15 USC § 7001 [d] [3].) This is the same result for the photo array under ESRA. It is thus unnecessary to pass on the scope of E-Sign, its impact on ESRA, or any constitutional issue relating to the validity or impact of E-Sign, or its preemption of ESRA. What is the original record of the photo array and how the court must, treat such record is the same under ESRA and E-Sign. Thus, it is unnecessary to determine which applies, as one or the other clearly does.
The court will defer to the trial court any decision regarding the applicability of Rosario to the notations on the initial array.
Accordingly, the defendant’s motion is denied in its entirety.

. The database for these photographs is persons previously arrested for similar crimes whose photographs are on file. The program selects from this database individuals who most closely resemble the description entered.

. A second array was also created and Kordes identified Gary Graham, who was separately charged, from such array.

. At the trial, the People will not offer these metro cards in evidence.

. At trial, the People will not offer the other two witnesses to make an in-court identification of the defendant.

. The crime of jostling does not necessarily entail the successful picking of a pocket.

. As the second printout is missing Kordes’ initials, there may be a Rosario question, which can be left to the trial court, as to whether such initials are Rosario material. As these markings were admittedly made subsequent to showing of the initial printout to Kordes, such issue need not be considered here, where the issue is the propriety and suggestiveness of the array as shown to Kordes.

. See Wickard v Filburn (317 US 111 [1942]), which is generally regarded as the high water mark of the extent of Congress’ Commerce Clause Power. This case stretched the scope of the Commerce Clause through the concept of affecting commerce to regulate one who grew grain for his own use on the grounds that such activity affected the interstate market for grain, and that such regulation was economically necessary to implement a national commodities regulatory program.

. If the purpose of E-Sign was to induce all states to adopt UETA, it has failed, as only 39 states have adopted UETA (as of April 2, 2002) and many have done so with changes. Thus, the state of law is neither simpler nor better as a result. If an issue relating to these statutes is presented where their outcomes conflict, the court must, before making a determination, rule on whether the transaction affects commerce considering the economic effect of the activity (at least in Wickard v Filburn [317 US at 125] the parties “stipulated a summary of the economics of the wheat industry”). Then, in states adopting a form of UETA, the court must determine whether that form was “as approved * * * by the National Conference of Commissioners on Uniform State Laws in 1999” (15 USC § 7002 [a] [1]). These concerns will continue to exist even after the constitutionality issues discussed in this opinion are resolved, and the resolution itself may well introduce other factual *540 determinations which may have to be made in deciding what these laws were supposed to have made simpler or better.